# RANKIN *v.* FIDELITY INSURANCE, TRUST AND SAFE DEPOSIT COMPANY.

ERROR TO THE CIRCUIT COURT OF APPEALS FOR THE THIRD CIRCUIT.

No. 178. Argued February 26, 27, 1903.—Decided April 6, 1903.

The following propositions may be considered as settled in regard to the liability of shareholders of national banks under section 5151, Rev. Stat.:

1. Liability may be established by allowing one's name to appear upon the books of the corporation as owner, though in fact he be only a pledgee. Nor can the real owner exonerate himself from responsibility by making a colorable transfer of the stock, with the understanding that at his request it shall be retransferred.

2. Stockholders of record are liable for unpaid installments, though in fact they may have parted with their stock, or held it for others.

3. A mere pledgee, however, who receives from his debtor a transfer of shares, surrenders the certificate to the bank and takes out new ones in

his own name, in which he is described as "pledgee," and holds them afterwards in good faith, and as collateral security for the payment of his debt, is not subject to personal liability as a shareholder. But it is otherwise, if he allow his name to appear on the book as owner, or being the owner, makes a colorable transfer of the stock.

Where it was shown that a trust company loaned on shares of a then solvent and dividend paying national bank, and accepted its stock as collateral, and subsequently the pledgor failed, and the trust company caused the stock to be transferred to one of its employés, paid an assessment subsequently levied upon the stock, and charged it to the pledgor, and frequently wrote to ascertain if there was any market for the stock, stating that it was held as collateral, *Held*, that although the construction of written instruments is one for the court, where the case turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character taken in connection with other facts and circumstances, it is one which is properly referred to a jury, and as this case really turned upon the actual ownership of the shares, such question of ownership was properly left to the jury as one of fact.

*Held*, that the pledgee is not bound by statements made without its knowledge by the assignees of the pledgors upon the schedules of liability to the effect that the pledgee had converted the stock.

THIS was an action at law by the receiver of the Keystone National Bank of Erie, Pennsylvania, against the defendant company, as the actual owner and holder of 172½ shares of the capital stock of the bank, standing upon its books in the name of one William W. Hand, to recover an assessment upon the shareholders of one hundred per cent made by the Comptroller of the Currency pursuant to Rev. Stat. sec. 5151.

The facts of the case are substantially as follows: On November 15, 1890, Delamater & Co., a banking firm of Meadville, Pa., borrowed $15,000 of defendant company, in renewal of prior loans, giving therefor their note for sixty days, and as collateral security deposited 230 shares of the capital stock of the Keystone National Bank of the par value of $100 per share, standing in the name of the individual members of the firm. The shares were valued at the time at par, $23,000; the bank was in good credit, and for twenty-seven years had regularly paid, and was then paying, semi-annual dividends. With its certificates of stock thus deposited, powers of attorney signed by the individual holders of the stock were also delivered to the defendant. These documents empowered the defendant to

transfer the shares—the name of the transferee and the attorney being blank.

Twenty days thereafter, and on December 5, 1890, Delamater & Co. failed and made a general assignment for the benefit of their creditors, and on December 17, defendant having received notice of the assignment, wrote to the assignees declining to renew the note, but offering to anticipate its payment and return the collaterals. It seems the assets of Delamater & Co. were insufficient for this purpose.

On January 10, 1891, defendant sent to the Keystone National Bank of Erie the original certificates, deposited as collateral, and requested the bank to transfer the shares to William W. Hand, a clerk in the employ of the defendant. Three days later, and on January 13, the bank paid a semiannual dividend of two per cent, but it does not appear who received this dividend, which proved to be the last one paid by the bank. The transfer was made on the books of the bank, and new certificates issued in the name of Hand, dated January 15, 1891, and were transmitted by the bank to the company, which acknowledged receipt of the stock, and stated that it would like to have a bid for the stock "if you know of a purchaser." Hand signed the transfer in blank on the back of these certificates, and in that form they were retained by the defendant. There was no receipt for the certificates except a memorandum in the handwriting of the clerk on the stub of the stock book: "Sent to the Fidelity Insurance, Trust and Safe Deposit Company, Philadelphia, Penn., 1 /17/ 91."

Fourteen months thereafter, and on March 16, 1892, the Comptroller of the Currency, finding that the capital of the bank was impaired, ordered an assessment of twenty-five per cent on the capital stock to make good the deficiency. The assessment upon these shares amounted to $5750. This amount was paid by the defendant and charged on its books to Delamater & Co. as an additional advance. Its cheque was sent to the bank in a letter signed by Mr. Hand.

On December 22, 1892, pursuant to Rev. Stat. sec. 5143, and with the approval of the Comptroller of the Currency, the capital stock of the bank was reduced from $250,000 to $150,000,

divided into 1500 shares of $100 each. Thereupon, and on January 24, 1893, the defendant sent to the bank the certificates for 230 shares, and on February 7 received the certificates in the name of Hand, for 172½ shares, being the reduced number. Hand signed a transfer in blank on the back of the certificates, and in that form they remained in the possession of the defendant. On March 20, 1894, the vice president of the defendant company addressed a letter to the bank stating that the company held 172½ shares of the stock registered in the name of W. W. Hand, and requesting a copy of their last statement and any other information regarding the business of the bank, and as to whether there were any sales of stock, saying "We would like to sell our holdings if marketable." No reply being received to this letter, the defendant company repeated its substance in another letter of April 4, stating that "as we have a loan of $22,000 depending upon the value of 172½ shares, we desire the above information." Several other letters were written to the same purport.

On June 29, 1897, the Keystone National Bank closed its doors; on July 26 the Comptroller of the Currency appointed a receiver, and on November 3 ordered an assessment of one hundred per cent on the stockholders. Whereupon this action was brought to recover an assessment of $17,250 on the shares registered in the name of Hand.

The case was tried before a jury, and the question submitted to them "whether before this Keystone National Bank failed, the defendant company—the Fidelity Trust Company of this city—was the real owner of these shares of stock, or whether it continued to be the pledgee of the stock; whether the stock had become theirs in the sense in which we use in ordinary speech the word owner, or whether it had been continued to be pledged to them as collateral security for the payment of the note which has been offered in evidence."

Upon the issue thus submitted the jury returned a verdict for the defendant, upon which judgment was entered, and the case taken to the Circuit Court of Appeals upon writ of error. That court affirmed the judgment. 108 Fed. Rep. 475.

*Mr. Asa W. Waters* for plaintiff in error.

*Mr. Richard C. Dale* for defendant in error.

Mr. Justice Brown, after making the foregoing statement, delivered the opinion of the court.

There being but little conflict in the testimony as to the actual facts, the question really is whether the court should have submitted the case to the jury, or instructed a verdict for the plaintiff.

By Rev. Stat. sec. 5151, "the *shareholders* of every national banking association shall be held individually responsible, equally and ratably, and not one for another, for all contracts, debts, and engagements of such association, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such shares;" and by sec. 5234, the receiver may, upon order of the proper court, enforce this individual liability.

Most of the cases arising under this section have turned upon the question whether defendant was in fact the owner of the shares. In this connection the following propositions may be considered as settled:

1. That liability may be established by allowing one's name to appear upon the books of the corporation as owner, though in fact he be only a pledgee. *Pullman* v. *Upton*, 96 U. S. 328. Nor can the real owner exonerate himself from responsibility by making a colorable transfer of the stock, with the understanding that at his request it shall be retransferred. *National Bank* v. *Case*, 99 U. S. 628; *Bowden* v. *Johnson*, 107 U. S. 251; *Stuart* v. *Hayden*, 169 U. S. 1.

2. Stockholders of record are liable for unpaid installments, though in fact they may have parted with their stock, or held it for others. *Hawkins* v. *Glenn*, 131 U. S. 319.

3. A mere pledgee, however, who receives from his debtor a transfer of shares, surrenders the certificate to the bank and takes out new ones in his own name, in which he is described as "pledgee," and holds them afterwards in good faith, and as

collateral security for the payment of his debt, is not subject to personal liability as a shareholder. *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606. But it is otherwise, if he allow his name to appear on the book as owner, or being the owner, makes a colorable transfer of the stock. *National Bank* v. *Case*, 99 U. S. 628.

Three cases in this court are specially pertinent to the one under consideration, and we have little more to do than to point out the salient facts of each and determine by which one of them this case is controlled.

In *National Bank* v. *Case*, 99 U. S. 628, it appeared that the Germania Bank lent $14,000 to the firm of Phelps, McCullough & Co., who, to secure the payment of the loan, pledged to the bank one hundred shares of the stock of the Crescent City Bank, with power, on non-payment of the note, to dispose of the stock for cash at public or private sale, without recourse to legal proceedings. At the same time a power of attorney was given authorizing a transfer of the stock to the Germania Bank. The note not being paid at maturity, a transfer was made to the Germania Bank on the transfer books of the Crescent City Bank. The stock was subsequently transferred to one of the clerks of the Germania Bank with an understanding between him and the officers of the bank that he should retransfer it at their request. It was held that, notwithstanding the transfer to the clerk, the stock remained subject to the bank's control, that the transfer was made to evade the liability of the true owners, and that as Phelps, McCullough & Co. had ceased to be the owners of the stock, the bank was liable. The liability was put by the court upon the ground that the stock was transferred to the Germania Bank upon the transfer books of the Crescent City Bank, and thereby the bank became subject to the liabilities of a stockholder, and that as a transfer of the stock to its clerk, Waldo, was colorable, it had not exonerated itself from that liability.

The case is distinguishable from the instant case by the fact that the stock was actually transferred to the bank upon the transfer books of the Crescent City Bank, which thus appeared as owner and that the subsequent transfer to Waldo was merely

colorable. There was also the further fact that the Crescent City Bank was in a failing condition when the transfer to Waldo was made, and there was no reasonable doubt that the defendant Germania Bank knew it, and made the transfer to escape responsibility. In the present case the stock was never transferred to the defendant, and the transfer to Hand took place within two months of the time of the original pledge, when the Keystone Bank was supposed to be perfectly solvent, and remained so for more than a year thereafter when the assessment of twenty-five per cent was made, the bank continuing in business until June 29, 1897, more than six years after the transfer to Hand.

In *Anderson* v. *Philadelphia Warehouse Co.*, 111 U. S. 479, the law as laid down in the prior case was somewhat relaxed, and a tendency manifested to look more closely at the equities. In that case Blumer & Co. borrowed a sum of money from the defendant, and as security for the loan transferred 450 shares of stock of the First National Bank of Allentown standing in the name of one Kern, a partner in the firm of Blumer & Co., on the books of the bank, and had a new certificate issued in the name of one Henry, president of the defendant warehouse company. The fact of the transfer of this stock to its president was brought to the attention of the directors of the warehouse company, who deemed it inadvisable to have the stock stand in the name of the president, and it was therefore transferred to one McCloskey, a porter in the employ of the company, and irresponsible. McCloskey never had possession of the certificate, and at the request of the warehouse company, gave a power of attorney for the sale and transfer of the stock, and shortly thereafter died. The stock was subsequently transferred to one Ferris, another employé, also irresponsible. Dividends were regularly paid on this stock to Kern, and the warehouse company never acted as a shareholder. It was held that, as there was no evidence of fraud or bad faith; as the warehouse company was never the owner of the stock, and never held itself out as such; never consented to a transfer of stock on the books; never claimed dividends, or acted as a shareholder, or ever pretended to be anything but a mere pledgee, it was not liable.

Said the court: " The creditors were put in no worse position by the transfers that were made than they would have been if the stock had remained in the name of Kern or Blumer & Co. who were always the real owners." It was held that, as the defendant promptly declined to allow itself to stand as a registered shareholder, because it was unwilling to incur the liability such a registry would impose, and asked that the transfer be made to McCloskey, from that time the case stood precisely as it would, if the transfer had been originally made to him instead of to Henry, the president of the company. " All this was done in good faith, when the bank was in good credit and paying large dividends, and years before its failure or even its embarrassment." The case differs from this only in the fact that here there was *some* evidence (enough to go to the jury) that defendant had held itself out as the owner of the shares.

In *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606, the stock which was delivered to the defendant as collateral security was reissued, and new certificates issued to the defendant as " pledgee." It was held that, as the stock book gave information that the defendant held the stock as pledgee only, it was not liable to an assessment. See also *Robinson* v. *South. Nat. Bank*, 180 U. S. 295; *Nat. Park Bank* v. *Harmon*, 79 Fed. Rep. 891; *S. C.*, 172 U. S. 644.

There is no doubt whatever that the defendant originally took blank transfers of the certificates of stock in question as security for its loan to the Delamaters; that at that time the stock was worth its face value, $23,000; had paid dividends for twenty-seven years prior thereto, and was in good credit. To charge the defendant with liability as a shareholder it must be made to appear that it had either become the owner of the shares in fact, or had held itself out to be the owner, and thereby estopped itself to deny its liability as such.

The first change in its attitude toward the stock took place within two months after the original pledge, and was caused by the failure of the Delamaters, which occurred within twenty days after the loan was made. The change consisted in sending back, January 10, 1891, the original certificates, and requesting the bank to transfer the shares to Hand, which was

done. Defendant evidently did not then intend to become the owner of the stock, as immediately after receiving notice of the failure of the Delamaters the vice president of the company addressed a note to them, or their assignees, calling attention to the note and the pledge of the stock, and saying that if they were prepared to anticipate the payment of the note and have the collateral returned, they would be glad to so arrange it; and in a further letter of May 5, 1891, to the Delamaters, he notified them that the note was secured by the Keystone Bank stock, and "if we cannot secure payment for the note and interest, I have to notify you that we shall proceed to sell the collateral at auction." It also appears that on July 7, 1892, the vice president of the company addressed a letter to the auditor of the Delamater estate, notifying him of their claim against that estate upon the note for $15,000, and stating that the company held the shares of the Keystone Bank as collateral for the loan. Thereafter, and on March 30, 1893, the company received a dividend of $795.60, to which it was undoubtedly entitled as pledgee.

Even so late as 1894 the vice president of the defendant company addressed a note to the Keystone Bank, requesting information regarding their business; whether there had been any sales of the stock and at what price, and saying that "as we have a loan of $22,000 depending upon the value of 172½ shares, we desire the above information." It is true that the defendant in 1892 paid an assessment of $5750 upon this stock, but the amount was charged to the Delamaters as an additional advance, and was evidently paid to save its interest in the stock from forfeiture. Rev. Stat. sec. 5205 as amended in 1876, 19 Stat. 64. It is not easy to see how the defendant could have done otherwise than it did without prejudice to its own rights, as well as to the rights of the assignees of the pledgors.

It is also evident that the assignees of the Delamaters treated the interest of the defendant in the stock as a mere pledge, since in their account filed in the Court of Common Pleas of Crawford County, July 13, 1896, they charge themselves in the account as follows: "Equities in stocks and bonds, pledged as collateral on loan unadjusted, as follows: (a) $23,000, stock of

the Keystone National Bank of Erie, pledged for a loan of $15,000, appraised at $8000." Proof was offered that in this account the assignees had made another entry, "said stock having been converted by the holder of the note, and said stock having been assessed to the amount of 25 per cent of its face value, did not sell for enough to pay the debt for which it was pledged." This memorandum was excluded, and properly so, by the court below, inasmuch as it was a mere assertion of fact made by these assignees without the knowledge of the defendant. The company could not be bound by a statement thus made by these assignees without its knowledge or acquiescence. Again, it was obviously untrue, as the stock had never been sold. Evidently all that was intended by the word "converted" was that the stock was not worth enough " to pay the debt for which it was pledged." There can be no doubt that defendant would have been willing at any time to surrender the stock upon payment of the debt, and that it retained it simply because it was forced to do so.

It is also true that a number of letters were written during the time the defendant held possession of its certificates, in which it made inquiries as to the value of the stock, the number of sales made, and spoke of itself as holding or owning the stock which it desired to sell, and that Hand once or twice voted the shares by proxy; but the bank clearly could not have been misled, as the nature of such ownership was shown in the letter of April 4, 1894, in which they spoke of a loan of $22,000 depending upon the value of 172½ shares, and repeatedly thereafter, and as late as April, 1897, said they were anxious to sell this stock " to close an account " for which it was collateral.

If such representations had been made either by a formal entry upon the books of the bank or to the public, or to any one who could have been prejudiced by them, defendant might be held to be estopped, but as they were made to officers of the bank, who understood perfectly the capacity in which the defendant retained the stock, it was properly held to be a question for the jury.

Plaintiff also offered to show in the stock ledger of the

bank over the name of W. W. Hand, in an account opened with him at the request of the defendant, a pencil memorandum at the top of the page in these words: "Fidelity Trust and Safe Deposit Company, Philadelphia." As it does not appear who made this memorandum, when or for what purpose it was made, or what it was intended to indicate, it was properly excluded from the consideration of the jury. It was probably explanatory of the fact that correspondence with regard to Hand's account was kept up with the defendant company. It had no tendency, however, to show anything inconsistent with defendant's position as pledgee of the stock. As the stock stood in Hand's name, the entry had no tendency to prove ownership in another. *Carey* v. *Williams*, 79 Fed. Rep. 906; *Sigua Iron Co.* v. *Greene*, 104 Fed. Rep. 854.

The fact that the certificates were put in the name of Hand, though calculated upon its face to awaken suspicion, wrought no material change in the situation. If defendant were in fact the owner of the shares, it could not avoid liability by listing them in the name of another. *National Bank* v. *Case*, 99 U. S. 628. If it were the pledgee, it had the option of listing these shares in its own name as pledgee, *Pauly* v. *State Loan & Trust Co.*, 165 U. S. 606; or in the name of another and irresponsible party, even though this were done for the purpose of avoiding liability, *Anderson* v. *Philadelphia Warehouse Co.*, 111 U. S. 479. The creditors were not injured, since if the exact truth had appeared upon the face of the certificates, by registering the shares as pledgee, they would have had no recourse against the defendant. Upon the other hand, if defendant had really owned the shares, it would have been a fraud to list them in the name of Hand. Perhaps it would have been less open to criticism to have listed them in its own name as pledgee, but as its failure to do so under the theory of the defendant that it was in fact the pledgee, misled no one, it should not be held liable for what was done in good faith and with no intent to defraud.

The case then really turned upon the actual ownership of the shares, and this question was properly left to the jury as one of fact. Although the construction of written instruments is one

for the court, where the case turns upon the proper conclusions to be drawn from a series of letters, particularly of a commercial character, taken in connection with other facts and circumstances, it is one which is properly referred to a jury. *Brown* v. *McGran*, 14 Pet. 479. In that case it was said by Mr. Justice Story that "there certainly are cases, in which, from the different senses of the words used, or their obscure and indeterminate reference to unexplained circumstances, the true interpretation of the language may be left to the consideration of the jury, for the purpose of carrying into effect the real intention of the parties. This is especially applicable to cases of commercial correspondence, where the real objects, and intentions, and agreements of the parties, are often to be arrived at only by allusions to circumstances which are but imperfectly developed." This case is specially applicable to the one under consideration, inasmuch as plaintiff relies chiefly upon the fact that defendant, in its correspondence with the bank, spoke of itself as owning or holding the shares standing in the name of Hand. Under the circumstances, it is entirely possible that the word "owner" may have been used in its ordinary sense, or as representing a pledgee upon whom the ownership of the shares had been cast by the failure of the pledgor, and the depreciation of the value of the shares to an amount insufficient to pay the note. It can hardly be possible that the statute was intended to impose a liability upon a pledgee, who had taken the shares as collateral security and, through the failure of the pledgors, had been forced against its will into the position of ownership. Such a result might operate to destroy altogether the possibility of raising money upon the deposit of national bank shares as collateral. See also *Fagin* v. *Connoly*, 25 Missouri, 94; *Prather* v. *Ross*, 17 Indiana, 495; *Roberts* v. *Bonaparte*, 73 Maryland, 191; *Macdonald* v. *Morrill*, 154 Massachusetts, 270.

This case could only have been withdrawn from the jury upon the theory that, taking all the testimony together, there could be but one reasonable interpretation put upon the conduct of the defendant with respect to these certificates. Such, in our opinion, is not the case. The fact undoubtedly was that the

defendant did not intend to impose upon itself the statutory liability of a shareholder, and considering that it had not only lost its original debt of $15,000 (less a small dividend) by the failure of the Delamaters, as well as the additional assessment of $5750 paid to save the shares from forfeiture, that there was no evidence of fraud or double dealing in its conduct, and that its liability was purely a technical one, it was not unnatural for the jury to require that such liability should be clearly established, before imposing upon it an additional burden of $17,250, for which it had received no possible consideration.

Some stress is laid by the plaintiff upon the fact that neither the Delamaters nor their assignees ever gave their consent to the transfer of the stock to Hand, but as the power of attorney originally given upon the deposit of the stock expressly authorized such transfer, and the rights of the defendant could only be protected in that way, there is no force in the objection, particularly in view of the fact that neither the Delamaters nor their assignees complained of such transfer. Being an act which it was authorized to take as pledgee, it cannot be made reponsible as owner therefor.

There was no error in the action of the Court of Appeals, and its judgment is therefore

*Affirmed.*

Mr. Justice Harlan dissented.