## FIRST NAT. BANK IN OKLAHOMA CITY v. HARRIS.*

Circuit Court of Appeals, Eighth Circuit.
May 4, 1928.

No. 7876.

1. **Banks and banking** ⬸269—**National bank may make or buy loan secured by pledge of stock of another bank, and purchase such stock when sold to satisfy loan.**

A national bank may make or buy a loan secured by stock of another bank, pledged as collateral thereto, and acquire by purchase such stock, when sold to satisfy the loan.

2. **Banks and banking** ⬸249(3), 283—**National bank held owner of stock of another bank, acquired as part of assets of third bank taken over by it, and liable for stock assessment.**

National bank held to be the owner of stock of another bank, acquired by it as part of assets of bank which it took over, and hence liable for stock assessment.

Kennedy, J., dissenting.

*Rehearing denied September 15, 1928.

In Error to the District Court of the United States for the Western District of Oklahoma; John H. Cotteral, Judge.

Action by A. P. Harris, as receiver of the City National Bank of Coalgate, Okl., against the First National Bank in Oklahoma City. Judgment for plaintiff, and defendant brings error. Affirmed.

W. F. Wilson, of Oklahoma City, Okl. (W. F. Wilson, Jr., and Wilson & Wilson, all of Oklahoma City, Okl., on the brief), for plaintiff in error.

J. H. Everest, of Oklahoma City, Okl. (G. T. Ralls, of Coalgate, Okl., and Ed. S. Vaught, P. D. Brewer, and Robert K. Everest, all of Oklahoma City, Okl., on the brief), for defendant in error.

Before STONE and VAN VALKENBURGH, Circuit Judges, and KENNEDY, District Judge.

STONE, Circuit Judge. This is an action at law by the receiver for the City National Bank of Coalgate, Okl., against the First National Bank in Oklahoma City, to enforce an assessment against the latter as a shareholder in the former bank. From a judgment in favor of the receiver, this writ of error is sued out.

Two contentions are presented here. One of them, which is properly not strongly urged, is that it was ultra vires the defendant to acquire and hold and, therefore, to be an owner of stock in the Coalgate bank. The second is that defendant never, as matter of fact, became the owner of the stock in question.

[1] I. The evidence clearly establishes that if defendant ever became the owner of this stock, it was through purchase at a foreclosure sale of such stock which it held as collateral for a promissory note which was in default. There can be no question of the right of a national bank to make or buy a loan secured by stock of another bank pledged as collateral thereto; nor to acquire, by purchase, such stock when sold to satisfy the loan. Germania National Bank v. Case, 99 U. S. 628, 25 L. Ed. 448; Ohio Valley National Bank v. Hulitt, 204 U. S. 162, 27 S. Ct. 179, 51 L. Ed. 423.

[2] II. The serious contention here made concerns the ownership of this stock. If defendant was such owner at the time the Coalgate bank was adjudged insolvent, it cannot escape the liability for this assessment. To understand and to determine this contention it is necessary to state the material facts. These facts are undisputed and are as follows:

In January, 1923, the affairs of the Southwest National Bank of Oklahoma City became involved. As a result thereof, the defendant entered into a contract, which action was approved by the chief national bank examiner of that Federal Reserve district, which is as follows:

"Agreement.

"Whereas, the Southwest National Bank of Oklahoma City and its shareholders by resolutions duly made at a special meeting have sold, transferred and set over unto the First National Bank in Oklahoma City certain properties, more particularly described in a resolution adopted by the shareholders and directors of said Southwest National Bank of even date herewith;

"And whereas, said First National Bank as a part of the consideration therefor has agreed to pay certain specified indebtedness due and owing from said Southwest National Bank to various third persons;

"And whereas the amount of the assets so transferred and sold to said First National Bank, as now shown upon the books and accounts of said Southwest National Bank of Oklahoma City are of the sum of $345,093.62 approximately in excess of the amount of said liabilities;

"And whereas, said First National Bank would not accept a sale and transfer of said assets and would not assume the liabilities in said resolutions specified because it was estimated that the true and collectible value of said assets so transferred to it and upon which it could realize would be less than the liabilities of said Southwest National Bank which it was by said contract to assume and agree to pay;

"And whereas, said Southwest National Bank has heretofore and at the time of making said sale and transfer of said assets to said First National Bank caused to be paid to it other and additional sums as follows, to wit:

"First, the sum of $25,000.00 paid by the Clearing House of Oklahoma City.

"Second, the sum of $43,300.00 paid as follows and by the following persons:

| | |
|---|---|
| C. H. Wright | $ 7,500.00 |
| G. A. Nichols | 7,500.00 |
| J. B. Klein | 7,500.00 |
| D. Replogle | 7,500.00 |
| C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle, jointly and severally | 15,300.00 |
| Total | $45,300.00 |

"Provided that the above $15,300.00 may be replaced by notes of other stockholders in the Southwest National Bank procured to be made by the makers of said $15,300.00 note and substituted in lieu thereof, but all said notes so substituted shall be acceptable to said First National Bank.

"Third, the sum of $204,700.00 paid by the following persons as next set opposite their names below, all being stockholders in said Southwest National Bank, to wit:

| | |
|---|---|
| W. M. Longmire | $  1,000.00 |
| J. F. Martin | 1,000.00 |
| O. C. Fowler | 2,000.00 |
| Ed. Howell | 1,000.00 |
| W. A. Donahue | 1,000.00 |
| James Brazill | 5,000.00 |
| G. A. Nichols | 10,000.00 |
| W. H. Donahue | 1,000.00 |
| G. E. Massey | 2,800.00 |
| D. N. Bell | 2,000.00 |
| Norman Nelson | 7,300.00 |
| A. M. Beets | 2,500.00 |
| B. C. Housel | 1,500.00 |
| Ben Barnett | 1,000.00 |
| C. T. Abel | 2,500.00 |
| Tom Baugh | 11,500.00 |
| W. M. Longmire | 6,000.00 |
| J. W. Whitenton | 3,500.00 |
| H. C. Leitnaker | 2,300.00 |
| J. B. Klein | 18,000.00 |
| C. H. Wright | 10,000.00 |
| J. F. Martin | 2,900.00 |
| Edward Howell | 4,000.00 |
| L. T. Sammons | 20,000.00 |
| L. T. Sammons | 32,000.00 |
| J. W. Shofner | 15,000.00 |
| J. A. Whiteford | 1,000.00 |
| D. Replogle | 25,000.00 |
| J. B. Boen | 5,000.00 |
| K. D. Gossom | 3,700.00 |
| J. I. Howard | 1,700.00 |
| Total | $204,700.00 |

Now, therefore, it is agreed that the sum of $343,093.62 being the excess of the amount at which said assets and properties so transferred by said Southwest National Bank to said First National Bank in Oklahoma City this day are now carried on the books of said Southwest National Bank over the liabilities, assumed and agreed to be paid by said First National Bank together with the aforesaid sums of money which the said Southwest National Bank has caused to be paid to said First National Bank by the persons as hereinbefore set out shall be and constituted a fund to be held by said First National Bank for a period of twenty-two months from this date and against said fund said First National Bank shall be entitled to make charges as follows:

"First, all property either real estate, leasehold interest, personal property, bonds, stocks and securities this day sold and transferred to said First National Bank by said Southwest National Bank that shall be sold

for any sum and upon which said First National Bank shall realize a sum less than the book value, that is, the value at which the same are now carried on the books of said Southwest National Bank as reflected by its books, shall as the same are sold and disposed of, and money realized thereon, be charged against said fund.

"Second, all notes, discounts, bills receivable and evidence of debt, or any renewal thereof or any part thereof, this day by said Southwest National Bank transferred to said First National Bank shall be from time to time as they shall prove uncollectible, either in whole or in part, be by the First National Bank charged against said fund, and for the purposes of this agreement it is agreed that the said First National Bank shall have the full and complete authority to make a charge of any note that shall remain unpaid for a period of thirty days after its due date against said account and the same shall for the purposes of this agreement be considered if the said First National Bank shall so elect, as uncollectible and such item properly chargeable against said account.

"Third, said First National Bank shall be entitled to charge all of the expenses of administration and collection of said assets to said fund thereafter.

"If at the end of the period provided by this agreement, or if at the end of twenty-two months from and after this date there shall remain in said fund a sum of money sufficient to pay to the aforesaid C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle, seventy-five hundred each for which they have given their several notes totaling Thirty Thousand Dollars ($30,000.00) and the sum of $15,300.00 for which they have given their joint and several notes being a total of $45,300.00, or such part thereof as it has cash available in said fund.

"Thereafter there shall be paid to the persons furnishing the $204,700.00 share and share alike in ratio of the sums respectively by them furnished the full amount of said sums so furnished or such part thereof as there shall remain on hands funds available therefor.

"Thereafter, the balance, if any remaining, shall be turned over to the said Southwest National Bank, or any of its duly authorized representatives.

"In lieu of the payment in money of the funds aforesaid and if any of the notes, bills receivable, discounts and evidence of debt so charged, either in whole or in part, against said account shall then remain on hands and undisposed of, then said notes and ac-counts so remaining unpaid and undisposed of shall be by said First National Bank turned over to the said C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle, who are hereby constituted a committee by the said Southwest National Bank and all parties interested to receive, accept and receipt the said First National Bank therefor.

"If at any time any note or other evidence of debt shall be charged against said account by said First National Bank, the said First National Bank will thereafter endeavor to collect the same, and if collected before the end of a period of twenty-two months, the same will be credited back to said fund, but if the same, or any part thereof, or any renewal thereof, shall not be collected and converted into money by the expiration of said period of eighteen months, then the same shall be delivered to C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle or any one of them, who are hereby authorized to receive, accept and receipt for the same to said First National Bank by said Southwest National Bank and all persons hereinbefore set out and described as interested in said transaction by reason of their furnishing the respective sums of money as hereinbefore set out.

"Dated at Oklahoma City, Oklahoma, this 22 day of January, 1923. First National Bank in Oklahoma City, by H. M. Johnson, Its President. [Seal.] Attest: T. N. Wells, Cashier. Southwest National Bank of Oklahoma City, by Tom G. Taylor, Its V. President. [Seal.] Attest: C. T. Abel, Cashier. G. A. Nichols, J. B. Klein, D. Replogle, C. H. Wright, Persons Furnishing the $45,300.-00. Edward Howell, J. A. Whiteford, A. M. Beets, Norman Nelson, J. W. Shofner, C. T. Abel, D. Replogle, J. B. Boen, John F. Martin, C. H. Wright, G. A. Nichols, J. B. Klein, J. I. Howard, Persons Furnishing the $204,-700."

The resolution of the stockholders of the Southwest National Bank, referred to in the first paragraph of the above agreement, was as follows:

"Be it resolved, by the Southwest National Bank of Oklahoma City, that the officers and directors and stockholders of said bank make to the First National Bank in Oklahoma City, the following proposition and offer to wit:

"The Southwest National Bank of Oklahoma City hereby offers to sell, transfer, assign and deliver over unto the First National Bank in Oklahoma City the following assets carried at this time on the books of the Southwest National Bank of Oklahoma

City, at the respective valuations, as next set opposite the items hereinafer enumerated to wit:

| | |
|---|---:|
| Notes and discounts, a full, true, complete and correct list of which is hereto attached marked Exhibit 1, amounting to....... | $2,070,923.57 |
| Trade acceptances, listed as per Exhibit 2, amounting to the sum of ...................·........ | 9,551.80 |
| Overdrafts disclosed by the ledgers of said bank listed as per Exhibit 3 ................... · | 29,572.22 |
| Bonds and warrants and stocks listed as per Exhibit 4, amounting to...................... | 219,467.53 |
| Banking house, furniture and fixtures, subject to a mortgage of $45,000.00, equity carried on the books of the bank at......... | 197,570.45 |
| Other real estate owned......... | None |
| Checks and cash items now in possession of the bank........... | 12,262.38 |
| Stock in Federal Reserve Bank.. | 10,500.00 |
| Amounts due it from other banks | 291,116.82 |
| Amount due from Federal Reserve Bank and in transit.......... | 364,550.09 |
| Exchanges for Clearing House... | 30,662.86 |
| Bills of Exchange.............. | 1,449.93 |
| Cash on hands................. | 5,227.95 |
| Being a total of........... | $3,242,855.60 |

"In consideration of the purchase price thereof, said First National Bank in Oklahoma City is to pay the following sums due and owing from the Southwest National Bank of Oklahoma City, to wit:

| | |
|---|---:|
| Due sundry banks from Southwest National Bank of Oklahoma City ....................·......... | $ 687,850.63 |
| Due to individual depositors as shown by the ledgers of said bank ...................... | 1,233,698.03 |
| Due to savings depositors as shown by the ledgers of said bank ...................... | 135,809.85 |
| Due to individuals on time deposits .................... | 180,750.00 |
| Due on certificates of deposit.... | 191,716.49 |
| Christmas Savings Club........ | 13,327.55 |
| Rediscounts .................· | 409,835.03 |
| Dividends unpaid.............. | 30.00 |
| Due on certified checks......... | 116.75 |
| Due on cashier's checks outstanding ..................... | 21,327.65 |
| Notes sold with agreement to repurchase ................... | 25,300.00 |
| Being a total of...........| $2,899,761.98 |

"All notes, discounts and evidences of debt to be assigned so as to pass title thereto to said First National Bank in Oklahoma City, separate assignments of mortgages, leasehold interests, titles, and deeds to real estate to be executed assigning and conveying the same to said First National Bank in Oklahoma City, and the officers and directors of this corporation are hereby authorized and directed, upon the acceptance of this proposition to execute the necessary agreements, papers and documents carrying into full force and effect the aforesaid transfer of the assets and properties of said Southwest National Bank of Oklahoma City, as hereinabove set out.

"And be it further resolved, that as a part of the consideration of said First National Bank in Oklahoma City, accepting said transfer and assuming the obligations as hereinbefore set out, that this corporation procure to be paid to said First National Bank in Oklahoma City, in addition to the assets as hereinbefore set out and transferred to it, the following sums of money, to wit:

"That it procure to be paid by the Clearing House of Oklahoma City, the sum of $25,000.00.

"That it procure to be paid by C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle, directors of said Southwest National Bank, the sum of $45,300.00.

"That it procure to be paid to the First National Bank in Oklahoma City by the following named stockholders of said Southwest National Bank of Oklahoma City, the sums of money as next set opposite their names below, the following sums:

| Name. | Amount. |
|---|---:|
| Brazil, James............... | $  5,000.00 |
| Nichols, G. A.............-.... | 10,000.00 |
| Donahue, W. H............. | 1,000.00 |
| Massey, G. E.............. | 2,800.00 |
| Bell, D. N.................. | 2,000.00 |
| Nelson, Newman........:..... | 7,300.00 |
| Beets, A. M................ | 2,500.00 |
| Housel, B. C............... | 1,500.00 |
| Barnett, Ben.............. | 1,000.00 |
| Abel, C. T................. | 2,500.00 |
| Baugh, Tom............... | 11,500.00 |
| Longmire, W. M............ | 6,000.00 |
| Whitenton, J. E............ | 4,500.00 |
| Leitnaker, H. L............. | 2,300.00 |
| Klein, J. B................. | 18,000.00 |
| Wright, C. H.............. | 10,000.00 |
| Martin, J. F............... | 2,900.00 |
| Howell, Edward............ | 4,000.00 |
| Sammons, L. T............. | 20,000.00 |
| Sammons, L. T............. | 32,500.00 |
| Shofner, J. W.............. | 15,000.00 |
| Whiteford, J. A............. | 1,000.00 |
| Repogle, D................. | 25,000.00 |
| Boen, J. B.......:......... | 5,000.00 |
| Gossom, K. D.............. | 3,700.00 |
| Howard, J. I............... | 1,700.00 |
| Longmire, W. M............ | 1,000.00 |
| Martin, J. F............... | 1,000.00 |
| Fowler, O. C.............. | 2,000.00 |
| Howell, Ed................ | 1,000.00 |
| Donahue, W. A............. | 1,000.00 |
| Total .................. | $204,700.00" |

On March 23, 1923, a special meeting of the stockholders of the Southwest National

·

further ratified the above agreement and adopted the resolution following:

"Resolved, that whereas, the Southwest National Bank has heretofore sold, transferred and assigned certain of its assets, being certain of its notes and accounts receivable to said First National Bank in Oklahoma City, and said First National Bank in Oklahoma City is now engaged in the process of liquidating all of said notes and accounts and the business of said bank under the terms of certain agreements evidenced by the resolution of both the stockholders and directors of said Southwest National Bank, received, accepted, approved and adopted by proper resolution of the directors of said First National Bank in Oklahoma City, the terms of which agreements, contracts and resolutions were well and truly known to the stockholders of said Southwest National Bank; and

"Whereas, by the terms of said agreements and contracts, said First National Bank in Oklahoma City purchaser of said assets has been by the shareholders in said Southwest National Bank guaranteed, in the collection of said assets by certain agreements, deposits and contracts made between said respective banks and the shareholders of said Southwest National Bank; and

"Whereas, by and under the terms of said agreements, said First National Bank in Oklahoma City has a period of twenty-two (22) months from the date of the purchase of said assets to collect and liquidate the same, and at the end of said period of twenty-two (22) months is to account to said Southwest National Bank and its shareholders therefor, and has agreed to return to said Southwest National Bank, such notes and properties as it shall be unable to collect, or in the absence of returning the same to pay over to the shareholders of said Southwest National Bank and the parties making such guaranty, the moneys collected by it and realized by it, if any, over and above the amount of the liabilities of said Southwest National Bank which it assumed and agreed to pay; and

"Whereas, in the liquidation of said notes and receivables of said Southwest National Bank, numerous, divers and intricate questions of policy and sound finance have already, and will arise from time to time, necessitating the taking, receiving and accepting conveyances of real estate upon the surrender and cancellation of some of the notes so received, transferred and sold to said First National Bank in Oklahoma City by said Southwest National Bank, and the

marshaling and handling of securities and interchange of securities afforded by said notes from time to time; and

"Whereas, it is impossible at this time to foresee and determine just what questions may arise in the liquidation of said affairs, and it is further impossible at this time to foresee and determine what plan of procedure or method of handling any of the separate items so transferred and assigned to it to be by it liquidated; and

"Whereas, the parties interested in said liquidation, being the shareholders of said Southwest National Bank, are too many in number and not available for the purpose of consenting to and having arrangements made with them in respect to such various questions as may arise from time to time, and delay on the part of the said First National Bank in Oklahoma City and its officers, agents and attorneys in the liquidation of said affairs to consult and obtain the consent of all of said shareholders would often defeat the best interests of said proceedings to liquidate the affairs of said Southwest National Bank:

"Now, therefore, be it resolved, that C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle be, and they are hereby named and designated as a committee of four to whom said First National Bank, its servants, agents and attorneys may from time to time refer each and all of said questions as they may arise in the liquidation of the affairs of said bank, and the determination of said committee of four, or of any three members of said committee in writing, communicated to said First National Bank authorizing it to proceed, receive and accept conveyances of property in lieu of notes and receivables held by it for said Southwest National Bank, and thereupon to cancel and surrender such notes and receivables; to receive, accept and exchange collaterals or securities thereto; to surrender up and deliver securities and cancel and surrender up notes and receivables from time to time, and the action of said committee, or the majority thereof so by this resolution designated, shall be final and binding upon the shareholders and all persons interested in the liquidation of said Southwest National Bank, and in lieu and instead of surrendering up and delivering unto the shareholders of said Southwest National Bank, or the guarantors as in said various contracts named, the original or renewal notes, receivables, securities or properties that were received, accepted, transferred and assigned to said First National Bank by said Southwest National

Bank, or the moneys representing the same, at and upon the completion of said liquidation according to the terms of said various resolutions and contracts, the written evidence of the consent on the part of said committee of four or a majority thereof authorizing such change and substitution, surrender and cancellation, shall operate as a complete surrender and accounting to the shareholders of said Southwest National Bank and the guarantors thereof in said contract named, of the agreement on the part of said First National Bank to account to said Southwest National Bank, its shareholders and guarantors, at and upon the expiration of the period as in said contract and respective resolutions provided."

At this same meeting, a letter from the deputy Comptroller of the Currency, dated February 24, 1923, directed to the cashier, acknowledged receipt of advice that:

"The business of your bank was taken over by the First National Bank of Oklahoma City as at close of business January 22d. A copy of the contract entered into between the two banks has also been received from the Chief Examiner.

"You are advised that a meeting of the shareholders should be called for the purpose of placing the Southwest National Bank in voluntary liquidation, which action may be effected by a vote of the owners of two-thirds of the stock of the bank."

Thereupon, a resolution was adopted as follows:

"Resolved, that the Southwest National Bank of Oklahoma City be placed in voluntary liquidation under the provisions of sections 5220 and 5221 of the United States Revised Statutes, to take effect June 1, 1923, and that C. H. Wright, G. A. Nichols, J. B. Klein and D. Replogle be appointed liquidating agent or liquidation committee of said bank; that liquidation shall be conducted in accordance with law and under the supervision of the board of directors, who shall require a suitable bond to be given by the said agent or committee in an amount to be fixed by the board of directors; that the said liquidating agent or committee shall render semi-annual reports to the Comptroller of the Currency on the 1st of April and October of each year showing the progress of said liquidation until said liquidation is completed; that said liquidating agent or committee shall render an annual report to the shareholders on the date fixed in the articles of association for said annual meeting, at which meeting the shareholders may, if they see, by a vote representing a majority of the entire stock of the bank, remove the liquidating agent or committee and appoint another in place thereof; that a special meeting of the shareholders may be called at any time in the same manner as if the bank continued an active bank, and at said meeting the shareholders may, by a vote of the majority of the stock, remove the liquidating agent or committee; that the Comptroller of the Currency is authorized to have an examination made at any time into the affairs of the liquidating bank until the claims of all creditors have been satisfied, and that the national bank examiner will be compensated for his time and expense in making the examination in question."

Also at this meeting was passed another resolution as follows:

"Resolved, that the liquidating agents and committee, J. B. Klein, C. H. Wright, G. A. Nichols and D. Replogle, make report in writing to every stockholder, every thirty (30) days, and make report to the stockholders assembled in writing every sixty (60) days of the progress of the liquidation of the bank under the contract and sale of the disposition of its assets made with the First National Bank in Oklahoma City."

Included in assets received by defendant under the above agreement, was a note for $2,000 by H. M. Shirley to Southwest National Bank, payable March 3, 1923, payment of which was secured by the pledge of a certificate for twenty shares of stock in the City National Bank of Coalgate.

This note coming into default, defendant filed its action in the state court on May 21, 1923, "as the owner and holder of said note and the holder of said stock pledged to secure the payment of the same," praying judgment for the amount due and a decree "foreclosing its pledge upon the stock hereinbefore described" and for deficiency judgment. September 18, 1923, judgment was entered for the face of the note with interest and attorney fees and the pledged stock ordered sold. September 28, 1923, public sale of this stock was made by the sheriff to Selma Ray for $500. The sheriff's return recites that he delivered the certificate to the purchaser; received the sum of $500; paid costs amounting to $44.75 and paid over the balance of $455.25 "to the plaintiff to apply upon the judgment herein rendered."

Selma Ray was a stenographer in the office of the counsel for defendant and a mere figurehead in the above transaction. The certificate was promptly forwarded to the Coalgate Bank and replaced by a new certificate for 20 shares issued to Selma Ray on

October 11, 1923, and received by her the following day. Selma Ray promptly indorsed this certificate in blank and it was delivered to defendant and held by it.

At the time when the stock was purchased as above, defendant had no knowledge of the insolvency of the Coalgate Bank. That bank failed November 3, 1923, and a receiver was appointed November 8, 1923. November 21, 1924, an assessment of $100 per share of the Coalgate Bank was made by the Comptroller of the Currency.

Stockholders' meetings of the Coalgate Bank were held October 26, 27, 29, and November 5, 1923. There is no showing or claim that the stock issued to Selma Ray was represented by any one at any of these meetings or that any one at any time, after the foreclosure sale, represented that stock in corporate matters.

According to the testimony of an officer of the defendant a system of books was kept by it covering the items received from the Southwest National Bank. These books showed no credit entry on the Shirley note but a charge (made May 9, 1924) of $2,223.-89, covering this note, interest thereon and expenses in connection therewith. This entry has been recognized as a charge in the settlement made between defendant and the Southwest National Bank. This stock was never entered on the books of defendant as its property. Defendant never paid or furnished to Selma Ray any money to make purchase of this stock. After realization upon all of the assets received from the Southwest National, except upon the bank building and after recovery upon all of the contributions provided in the contract, defendant lacked something in excess of $100,-000 of realizing the amount of liabilities which it had assumed for the Southwest National under the contract.

The same witness testified that he thought he had seen the certificate but was not sure and that search had been made for it in the files where collateral coming from the Southwest National was kept and it could not be found. He also testified that this note had been handed to counsel with no particular instructions except to recover what they could thereon.

Counsel referred to by the above witness testified that:

"We were unwilling to let the stock remain any longer in the original pledgee's name for the reason on investigation I thought he was insolvent and didn't want to take the risk of him having the stock in his name, and it was transferred in this manner to complete the title of the bank as pledgee and delivered to the bank to hold as pledgee of the original note that Mr. Shirley had assigned to the Southwest National Bank and which the First National Bank had placed in my hands for liquidation."

He also testified that his purpose in having the stock transferred to Selma Ray was "to keep alive the pledge" and that the purchase was for the benefit of defendant "as pledgee" and to hold the stock "as collateral for that note"; also that Selma Ray acted at his request "for the accommodation of the bank and as evidence of the pledge made to secure the $2,000 note of Shirley"; also as follows:

"Q. Why did you not at that sheriff's sale buy the stock in the name of the bank as pledgee? A. I didn't want the legal title to go to the bank because I didn't have authority to act for the bank in that way. We wanted to perpetrate [perpetuate] the pledge just as it was, except we were unwilling to let Shirley continue owning the stock on the record."

The judgment on the note in the state court contains a statement as follows:

"Plaintiff introduced in evidence the written promissory note set out and described in plaintiff's petition and delivered the same to the clerk of this court for cancellation."

The original note had indorsed across its face the number of that case in the state court and a notation of cancellation as follows:

"39100. Canceled in judgment, Sept. 18, 1923. Court Clerk, by Fritz Blumental, Deputy. Filed in district court, Oklahoma county, Oklahoma, Sept. 18, 1923. Cliff Myers, Court Clerk, by Carl Fraul, Deputy."

Admitting that it had the stock bought in at the sheriff's sale and that it held it in some capacity, defendant's contention is as follows: Under the contract, it was to liquidate the affairs of the Southwest National, pay its debts and make settlement thereafter with the directors, shareholders and liquidating committee of that bank; that in all actions which it took thereunder, it was acting only as a liquidating agent for the use and benefit of the Southwest National; that in exercising its judgment, as such liquidator, it deemed it wise to take the stock out of Shirley's name; that, therefore, it instituted the action on the note resulting in sale of the stock and bought the stock in as such liquidator, in a representative capacity, and solely for the use and benefit of the shareholders of the Southwest National; that it had the

new certificate issued to Selma Ray, indorsed by her in blank and thereafter held it as collateral to the Shirley note. It claims to have taken the stock as pledgee to the note and relies upon those cases (Pauly v. State Loan & Trust Co., 165 U. S. 606, 17 S. Ct. 465, 41 L. Ed. 844; Anderson, Receiver, v. Philadelphia Warehouse Co., 111 U. S. 479, 4 S. Ct. 525, 28 L. Ed. 478; Robinson v. Southern National Bank of New York, 180 U. S. 295, 21 S. Ct. 383, 45 L. Ed. 536; Rankin v. Fidelity Insurance, Trust & Safe Deposit Co., 189 U. S. 242, 23 S. Ct. 553, 47 L. Ed. 792), holding that a pledgee of national bank stock is not regarded as the owner thereof subject to assessment as a shareholder where the pledgee has never appeared nor been registered as a stockholder of record.

This contention and position of the defendant necessitates an examination of the relationship which it assumed under the contract and what the evidence shows it did concerning this stock. The relationship assumed is revealed in the contract itself and the above quoted resolution of the Southwest National which is incorporated into the contract by reference contained in the first and second paragraphs thereof. Taking this resolution and the agreement and considering them together, the result seems to be that the defendant assumed the absolute liability to pay the specific items of indebtedness of the Southwest National set forth in the resolution amounting to a total of $2,899,761.98; that the consideration for this obligation was the complete legal title to the assets of the Southwest National enumerated in the above resolution (having a total value, on the books of that bank, of $3,242,855.60) and the payment to it of $25,000 by the Oklahoma City Clearing House Association, of $45,300 by four of the directors of the Southwest National and of $204,700 by certain of the stockholders of that bank. The agreement did not contemplate that defendant should make a money profit out of this transaction, for it provided that the excess of book value ($343,093.62) of the above assets over the liability assumed and the three amounts of cash above contributed should constitute a fund to be held by defendant for a period of 22 months; that this fund should be chargeable by defendant with any realized loss on the book value of the assets thus obtained by it with all items which it might deem uncollectible and with all expenses of administration and collection of such assets. If, at the end of the above period, there remained anything in this fund after making the above charges, such balance was to be devoted, first, to repayment of the $45,300 contributed by the four directors, next, to repayment of the $204,700 contributed by the shareholders, and any final balance to be turned over to the Southwest National. In lieu of such payments from this fund any undisposed of obligations received from the Southwest National were to be turned over to a committee representing the Southwest National.

The net result of this arrangement, concisely stated, is that defendant assumed certain liabilities and acquired certain property from the Southwest National with which to pay them and, to secure itself from any deficiency in this property to meet such liabilities, it had recourse against a fund contributed by the Clearing House, certain directors and certain stockholders of the Southwest National; with the right and obligation to use such fund only for the above purposes and to return any surplus or any undisposed-of property which had come to it, at the end of twenty-two months. Also, that it acquired complete title to all of the assets, including the Shirley note.

Our conception is that, under this contract, defendant was in no sense an agent or trustee for the Southwest National. It is true, that any notes and accounts remaining unpaid and undisposed of at the end of 22 months were to be turned over to the committee, but this was not a return to the Southwest National of such assets but was "in lieu of the payment in money of the funds aforesaid" which provision was obviously for the protection of the Clearing House, directors and stockholders who had contributed to the deficiency fund turned over to defendant. We cannot think that there was any liability, as principal, created by this arrangement on the part of the Southwest National nor any liability, as agent, on the part of defendant. It was an out and out sale of assets in consideration of an assumption of liability with an accounting over for any surplus realized.

If the above conception of the relationships created by this arrangement be true, then, during the period covering all of the transactions concerning this stock, defendant was the absolute owner of this note with the attendant right of exercising its own judgment concerning it.

The defense here is based on the proposition that the sale of the security was merely to remove title from Shirley while still retaining the stock as collateral security for the note and that in so acting, defendant moved solely as the agent of the Southwest

National and in its behalf. In our opinion, the undisputed facts destroy both branches of this contention. Defendant had no legal right to thus change the title of the stock while keeping undisturbed its status as collateral to the note. The collateral agreement under which the stock was deposited permitted no disposition thereof by the holder of the note except a sale with the resulting application of the proceeds to the payment of the note. This agreement contained no provision in any wise allowing a bare change of title in the stock without disturbance of its relation to the note. However, no attempt was made by defendant to carry out its alleged purpose except through a suit to recover on the note and, as an incident thereto, realization upon the collateral through sale of the pledged stock. In that action, as shown by the judgment therein, "plaintiff introduced in evidence the written promissory note set out and described in plaintiff's petition and delivered the same to the clerk of this court for cancellation." Also, the indorsement across the face of the note is as follows:

"39100. Canceled in Judgment, Sept. 18, 1923. Court Clerk, by Fritz Blumental, Deputy. Filed in district court, Oklahoma county, Oklahoma, Sept. 18, 1923. Cliff Myers, Court Clerk, by Carl Fraul, Deputy."

There can be no question that the result of this suit was to merge the note into the judgment, leaving the latter as a liquidated liability replacing the contract liability represented by the note. The purpose and effect of the sale of this stock, under the judgment, was to destroy its relation as collateral to the loan, by selling all rights of the pledgor and also of the pledgee therein and substituting the proceeds of such sale as a credit, not upon the note, but upon the judgment upon the note. Whoever might buy this stock under this sale would become its owner free of any connection whatsoever with the note or with the judgment. Therefore, it results that the position of defendant that its purpose and the effect of the action in the state court was merely to change the title to the stock and nothing more, is impossible both because there was no longer any obligation upon the note and because there was no longer any stock held as collateral to the note. Also, defendant's position that what it did in this state suit was merely as the agent or trustee of the Southwest National, is unfounded because it occupied no such relation to that institution and could not, by such course of procedure, create such relationship.

We think the undisputed facts, shown in this record not only justify, but compel, the conclusion reached by the trial court.

The judgment must be and is affirmed.

KENNEDY, District Judge (dissenting). Briefly stated, my views are that when the contract is taken by and large with the surrounding evidence in the case it is in effect a liquidating contract. While the First National Bank received all the assets, together with the note and its collateral security in controversy, nevertheless it was obligated to use its best efforts to make a collection of all such assets, and if any sum remained after discharging the liabilities of the Southwest National Bank, and after the First National had been made whole on account of the transaction, it was bound to return the overplus to certain stockholders and directors who had theretofore made advancements and any ultimate balance to trustees for the Southwest Bank. Under these circumstances, it was the duty of the First National Bank to use its best judgment in making collection of all outstanding assets and securities, and when its officials presumed to discharge this obligation, simply because it turned out badly, that institution should not be penalized by being compelled to pay an assessment upon the stock in another bank, the equity in which it tried to save in discharging the obligation of its trust, especially in view of the fact that the stock was never carried in its own name, and no depositor or creditor of the Coalgate Bank was in any way deceived by the transaction. Without this additional burden, the First National Bank had already lost over $100,000.00 in an effort to save the community from the horror of another bank failure. In my view, the case should be catalogued with Anderson v. Philadelphia Warehouse Co., 111 U. S. 479, 4 S. Ct. 525, 28 L. Ed. 478, and Pauly v. State Loan, 165 U. S. 606, 17 S. Ct. 465, 41 L. Ed. 844.