UNIVERSAL PRODUCTS COMPANY, INCORPORATED, a corporation of the State of Delaware, Defendant Below, Plaintiff in Error, *v.* ANNETTE E. EMERSON, Plaintiff Below, Defendant in Error.

(*May* 13, 1935.)

WOLCOTT, Chancellor, LAYTON, C. J., HARRINGTON and REINHARDT, J. J., sitting.

*Charles F. Curley, William G. Mahaffy* and *James M. Tunnell* for Plaintiff in Error.

*Hugh M. Morris* and *Ivan Culbertson* for Defendant in Error.

Supreme Court, No. 3, June Term, 1934. Writ of Error to the Superior Court for Sussex County, Action of Debt, No. 26, June Term, 1931.

HARRINGTON, J., delivering the opinion of the Court:

Under its assignments of error, Universal Products Company, the defendant below, the plaintiff in error, contends that the court below should be reversed:

1. Because it abused its legal discretion when it refused to set aside the verdict of the jury, and to grant a new trial in this case.

2. Because, at the trial, it gave certain erroneous instructions to the jury.

3. Because, at the trial, it failed to give certain requested instructions to the jury.

In connection with the first contention made by it, the defendant below claims that the evidence before the jury in the trial court did not sustain their verdict, and the judgment for Annette E. Emerson of $165,216.97 based thereon, and should, therefore, have been set aside on its motion. This was because of the further contention that it so clearly appeared by uncontradicted evidence that the original royalty agreement had been changed by a subsequent agreement of the parties, made September 27, 1926, whereby the royalty of 25c on each and every joint had been reduced

to 12½c on the so-called "G" or small joints, that no verdict for any such amount as was found by the jury was legally possible.

The record, undoubtedly, shows that beginning with September 9, 1925, the defendant below, by letters and telegrams, was insisting on the change in question being made in the original royalty agreement; and that between that date and March 28, 1928, there were numerous letters and telegrams between J. B. Flick, President of Universal Products Company, and Victor L. Emerson, the husband of Annette E. Emerson, the plaintiff below, relating to that question.

Apparently, there were also some personal interviews and telephone conversations between these parties during this time, but we do not know what took place at them as Mr. Flick died in March of 1932, before the case was tried in the court below, and Mr. Emerson, though present at the trial, was not interrogated on that question.

It is conceded that Mrs. Emerson was, also, present at the trial in the court below, but did not testify.

Passing for the moment the question as to whether the record conclusively shows that Mr. Emerson had the right to bind Mrs. Emerson by any such modification contract, we will first consider whether it appears beyond question that the contract relied on was made, or whether that was for the jury to determine.

On August 23, 1926, Victor L. Emerson wired Mr. Flick, the President of Universal Products Company, the defendant below, the plaintiff in error,

"just returned and received your message Call me by 'phone Monday will arrange practically as outlined on small joint as submitted."

On September 8, 1926, Mr. Flick wired Mr. Emerson

"I am anxiously awaiting authority to use the 25c Royalty price on the Model 'G' Universal Joint. You promised me over the telephone

that you would attend to this last week. Now get busy so that I will have something to back up what I am trying to do."

Apparently receiving no reply to this message, on September 14, 1926, Mr. Flick again wired Mr. Emerson,

"Can I depend upon the twenty-five cent Royalty on Model 'G'. This is very urgent and may mean the loss of big business if it can not be done. Must have some assurance from you. Wire reply and write me that it will be done."

Still receiving no reply from Mr. Emerson, Mr. Flick again wired him on September 16, 1926,

"Can you answer my wire of fourteenth. If I slip on this it may mean anywhere from ten to twenty thousand loss for you next year. Wire me to-day just what you can assure me of."

On September 17, 1926, Mr. Emerson wired Mr. Flick,

"Will confirm by letter our conversation concerning reduction and use of special joint license for cover. It is understood that in no case will these special joints be substituted, or in any way interfere with the use or conditions controlling other models of joint. Have been engaged with the oil hence the delay."

On the same day, September 17, 1926, Mr. Flick telegraphed Mr. Emerson thanking him for his wire. He, also, added,

"I anticipate some things in a short time that will interest you and will wire which way the bug hops."

By later and repeated telegraphic messages during the same month, he continued to insist on the requested reduction being made in the then agreed royalty on the "G" or small joint. In one of these telegrams he, in part, said,

"Pass up the metal boot on the G joints we have figured to sell this job at cost to get in on the market; notwithstanding we have spent thousands of dollars to put this across. Our competitors are over fifty cents a job lower than us and you know what this means. Have Mrs. Emerson and Shaffer wire us Saturday if this can be done; Monday may be too late."

The following telegram by Mr. Flick to Mr. Emerson

is not dated, and the record is not perfectly clear as to when it was sent. There is testimony, however, that it was sent in the Fall of the year 1926. From its language it would seem to be the next in order of time. It stated,

"I am only asking the concession on 'G' model. It will have to be sold for less than Six Dollars complete. I feel certain we can land this job on twenty-five cent basis. Monday noon is the time they have given us for final decision and it will mean thousands of dollars to you. Wire me early Monday."

Mr. Emerson made no reply to these requests until September 27, 1926. On that day he telegraphed Mr. Flick, stating, among other things:

"You asked that royalty on the half size (the 'G' joint) be reduced to twenty-five cents per set which I grant conditionally upon your statement that the same is to be sold direct to actual builders of quantity production only for less than Six Dollars per set and that it will not be used or substituted on cars using No. A joint and in no way interfere with the sale price of other size joints. If sold for Six Dollars or more the royalty to be six per cent. of the gross selling price otherwise to be subject to conditions in existing contract."

At the end of this telegram he, also, said,

"As soon as possible will take necessary steps to protect the Universal Products Co. and myself. It is understood that the conditions herein will be embodied and signed in a contract representing A. E. Emerson and myself. Wire me if satisfactory."

Mr. Flick telegraphed Mr. Emerson the same day, namely, September 27, 1926,

"We have christened the size double A to Model G to get away from other present Model A as far as possible to avoid errors. * * * Your wire satisfactory and hope to send you word that we will get this job * * *."

The latter words, apparently, referred to a job which Flick had stated in an earlier telegram that he thought he could land on a 25c basis.

On March 1, 1927, Mr. Flick wrote Mr. Emerson quoting in full the Emerson letter of September 27, 1926.

After stating in this letter that it was important to get the royalty situation cleared up with Shaffer, he added, however,

"Even according to your wire you mention the fact that a contract will be signed representing A. E. Emerson and V. L. Emerson.

"I have every confidence in * * * your ability to do this, at the same time we do not want any flare-backs and can not afford to have any tangle whereby we would be compelled to pay 50c royalty * * *. You also mention a price of $6.00 or more on a 6% basis. This should be eliminated * * *."

Mr. Flick then gave his reasons for the last statement. In closing his letter he, also, said,

"You suggested that we send in the Royalty checks and just list the 'G' Universal Joints at 25c, same as we have done on the single end Universal Joints. If my interpretation or understanding of this is correct, we will do this in accordance with your instructions."

After repeated requests from Mr. Flick for a reply to this letter, Mr. Emerson finally telegraphed him that Mrs. Emerson was away and that both of them would write him when she returned home. On May 4, 1927, Mr. Emerson wrote Mr. Flick asking for a sample of the "G" joint so that he could compare it with drawings submitted, adding

"then I would have something to go on from actual facts, in being entitled to a reduction owing to its diminutive size."

Before closing this letter, and after stating that he had been ill with the Grippe, he stated,

"When I get well I will be out that way and I will try to arrange matters to meet the conditions."

Replying to this letter, Mr. Flick wrote Mr. Emerson on May 10, 1927, that he was sending the sample requested and, also, stated that he trusted he could

"anticipate some sort of agreement or permission to pay the 25c Royalty instead of 50c as at the present time."

He, also, stated that his Company had an order for 15,000 joints on which they intended to start production that month and that

"it was only through the cut on your part that we were able to land it   *   *   *."

On September 7, 1927, Mr. Flick wrote Mr. Emerson that he had been awaiting "ages and ages" for him to find time to give him (Flick) a letter of authority from Mrs. Emerson and himself regarding the royalty on the "G" size Universal Joint. After referring to the close competition in business and stating that if Emerson were able to grant a straight 25c royalty his check would be larger, Mr. Flick then said:

"As long as you and I are both alive chances are that it will be alright."

But in case of death "there might be some mix-up." Later on in the same letter, Mr. Flick, after stating that it seemed hard to get things going right but it looked better then than it had ever looked, then added

"and it is up to you to come through and protect me."

Receiving no reply from this letter, Mr. Flick again wrote Mr. Emerson on September 23, 1927, requesting a reply, and on October 11, 1927, Mrs. Emerson telegraphed Mr. Flick that Mr. Emerson was away on business, but that on his return she would "have him attend to subject matter in your letter."

Apparently, hearing nothing from Mr. Emerson, Mr. Flick on November 10, 1927, and again on December 1, 1927, wrote him insisting that "he dope out" something to protect the defendant below, as both Flick and Emerson might die.

In the letter of November 10, he stated,

"You promised me a year ago that you would do something but you failed to come thru."

Again on December 1, 1927, Mr. Flick wrote Mr. Emerson,

"I have spent a lot of money in postage trying to get a rise out of you regarding authority from yourself and Mrs. Emerson on the royalty for the 'G' job.

"Now take five minutes of your time, dope out something and send it on to me. You and I might die in the next two weeks and nobody do anything about it."

On December 5, 1927, Mr. Emerson telegraphed Mr. Flick,

"Will confirm the authority given you on small model as sent me. Have been preparing defense in the oil suits expect to finish in a couple of days and will then attend to this."

On February 9, 1928, Mr. Flick telegraphed Mr. Emerson,

"Have substantial shipments of small joints, one end only, last month. Would it be better to report to each of you one-half of the number of joints shipped at 12½c or the full amount at 6¼c. Wire reply. Tomorrow is the day."

These figures are probably explained by the fact that Mr. Shaffer was entitled to a one-half part of all royalties due Mrs. Emerson.

In reply to the above telegram, Mr. Emerson wired the defendant below,

"Think it best to conform to agreement and report full amount of joints delivered each month with size, price and purchaser."

On March 26, 1928, Mr. Flick telegraphed Mr. Emerson, in part, as follows:

"What in the world is the matter with you? I have been begging you for nearly three months to get some 'Dope' to me, that is a copy of Sutphens agreement, as well as something signed by you and Mrs. Emerson regarding the royalty for the small job. You certainly are laying down on the job in great shape and I have never known you to be quite so bad before."

Based on this correspondence, Universal Products Company, the defendant below, and the plaintiff in this court, contends that the record conclusively shows that, pursuant to its repeated requests, Mr. Emerson, by his telegram of September 27, 1926, on certain conditions therein specified, offered to reduce the royalty on each of the so-called "G" or small joints to 12½c or to 25c per set; that such offer was promptly and unconditionally accepted by Mr. Flick, its President, on the same day, and that a binding contract was, therefore, entered into.

It further contends that the consideration for the promise of Mrs. Emerson, acting through her husband as her agent, was the benefit that would be derived by her from the increased sales that would naturally result from the reduced sale price made possible by this agreement, and which fact was repeatedly referred to in the correspondence between Flick and Emerson.

The defendant below, also, contends that the telegram of Emerson to Flick on December 5, 1927, confirmed the authority already given by the previous contract of September 27, 1926; and that the numerous letters and telegrams between Emerson and Flick after September, 1926, merely showed demands by Flick for better evidence of the contract, the terms of which had already been agreed on, and could have no other possible effect. Other contentions made by that company will be referred to at a later stage of this opinion.

The letters of Flick dated September 8, 1926, March 1, 1927, and March 26, 1928, and the telegram of Emerson dated February 9, 1928, and Flick's reply thereto of the same date were put in evidence by the plaintiff below. The remaining letters and telegrams were introduced by the defendant below, the plaintiff in error.

In most cases, when the evidence produced to prove the making of a contract consists wholly of letters

and telegrams, or other documentary evidence, the authenticity of which is not denied, it is the duty of the court to determine whether a contract has been made. *Taplin & Rowell v. Marcy,* 81 *Vt.* 428, 71 *A.* 72; *Macbeth .v. Haldimand,* 1 *T. R.* 172, 180; *Ellis v. Block,* 187 *Mass.* 408, 73 *N. E.* 475; *Ennis Brown Co. v. Hurst & Co.,* 1 *Cal. App.* 752, 82 *P.* 1056; *Lea v. Henry,* 56 *Iowa* 662, 10 *N. W.* 243; *Union Service Co. v. Drug Co.,* 148 *Mo. App.* 327, 128 *S. W.* 7; *Thompson on Trials,* §§ 1067, 1068, 1072, 1073. See, also, *Thompson on Trials,* § 1108.

█ This rule does not apply, however, where the question, as to whether an alleged contract was made, turns on the proper conclusion to be drawn from a series of letters and telegrams considered in connection with other pertinent facts and circumstances proved. *Taplin & Rowell v. Marcy,* 81 *Vt.* 428, 71 *A.* 72; *Ellis v. Block,* 187 *Mass.* 408, 73 *N. E.* 475; *Dougherty v. Briggs,* 231 *Pa.* 68, 79 *A.* 924; *Rankin v. Fidelity Ins. Co.,* 189 *U. S.* 242, 23 *S. Ct.* 553, 47 *L. Ed.* 792; *White v. Lumiere Co.,* 79 *Vt.* 206, 64 *A.* 1121, 6 *L. R. A.* (*N. S.*) 807. In other words, it does not apply when any real issues of fact, outside of written evidence, whether as to the proper inferences to be drawn from the acts of the parties, or otherwise, are involved. When, therefore, the evidence to prove the contract relied on consists, in part, of letters and telegrams passing between the parties, and, in part, of oral testimony as to statements made at personal interviews, or by telephone, and there is a dispute as to what was said at such times, whether or not a contract was made is for the jury to determine. *Rogers v. Fenimore* (*Del. Super.*), 41 *A.* 886, not reported in State reports; 1 *Elliott on Contracts,* § 44; 13 *C. J.* 782.

But on principle it would seem that the mere fact that there were personal interviews and telephone conversations, as well as letters and telegrams passing between the parties, would not, in most cases, make the existence of the alleged

contract a jury question, if there were no evidence, whatever, as to what was said on these occasions.

The telegram of Emerson to Flick, dated September 27, 1926, contains the following statement,

"As soon as possible will take necessary steps to protect the Universal Products Co. and myself. It is understood that the conditions herein will be embodied in a contract representing A. E. Emerson and myself."

■ Where it is clearly understood that the terms of a proposed contract, though tentatively agreed on, shall be reduced to writing and signed before it shall be considered as complete and binding on the parties, there is no final contract until that is done. *Williston on Contracts*, § 28.

■ As was said, however, in *Disken v. Herter*, 73 *App. Div.* 453, 77 *N. Y. S.* 300, affirmed without opinion in 175 *N. Y.* 480, 67 *N. E.* 1081,

"Where all the substantial terms of a contract have been agreed on, and there is nothing left for future settlement, the fact, alone, that it was the understanding that the contract should be formally drawn up and put in writing, did not leave the transaction incomplete and without binding force, in the absence of a positive agreement that it should not be binding until so reduced to writing and formally executed."

The same rules are, perhaps, even more clearly stated in *Miss., etc., S. S. Co. v. Swift*, 86 *Me.* 248, 29 *A.* 1063, 1067, 41 *Am. St. Rep.* 545, in the following language:

"If the written draft is viewed by the parties merely as a convenient memorial or record of their previous contract, its absence does not affect the binding force of the contract. If, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed."

See, also, *Ridgway v. Wharton*, 6 *H. L. Cas.* 238, 10 *Eng. Rep.* 1287; *Rossiter v. Miller* (*House of Lords*), 3 *App. Cas.* 1124; *Lyman v. Robinson*, 14 *Allen* (*Mass.*) 242; *Williston on Contracts*, § 28.

[5] When, therefore, the evidence discloses that in the negotiations between the parties, the execution of a formal written contract is contemplated, that is some evidence that any prior oral, or other informal agreement by correspondence, is merely tentative, and not final; and the real intent of the parties is usually a question of fact for the jury to determine. *Rossiter v. Miller (House of Lords)*, 3 *App. Cas.* 1124; *Methudy v. Ross*, 10 *Mo. App.* 101, 106; *Miss., etc., S. S. Co. v. Swift*, 86 *Me.* 248, 29 *A.* 1063, 41 *Am. St. Rep.* 545; *Wharton v. Stoutenburgh*, 35 *N. J. Eq.* 266; *Bryant v. Ondrak*, 87 *Hun* 477, 34 *N. Y. S.* 384; *Irish v. Pulliam*, 32 *Neb.* 24, 48 *N. W.* 963; *Berman v. Rosenberg*, 115 *Me.* 19, 97 *A.* 6; 1 *Williston on Contr.*, § 28.

When it appears to the satisfaction of the court that an offer and an unconditional acceptance has been made by letters and telegrams alone, the authenticity of which is not denied, the parties are bound by the contract resulting therefrom.

When the telegram relied on to constitute the offer in such a contract contains language indicating that a future formal contract is contemplated, and no independent facts and circumstances are involved, the meaning of that clause is for the court, and not for the jury, to determine.

In this case, however, as we shall hereafter see, the evidence concerning the making of the alleged contract is not confined to written instruments and is such that the intent of the parties, in that respect, is for the jury to determine. See *Miss., etc., S. S. Co. v. Swift*, 86 *Me.* 248, 29 *A.* 1063, 41 *Am. St. Rep.* 545, and cases above cited.

In *Thompson on Trials*, § 1072, the author says,

"Where the question of contract or no contract is to be determined from the acts, as well as the writings, in order that the court shall determine it, the act must be established by uncontroverted evidence and must be of an unequivocal character. If they admit of different

inferences as to the intent, the question is, on principle, one of fact for a jury."

See, also, *Thompson on Trials,* §§ 1083, 1086.

In other words, as has been aptly and concisely said, in most cases, "an admixture of parol with written evidence draws the whole to the jury." *Doe, etc., v. Crane,* 16 *Ala.* 570; *Gardner v. Clark,* 17 *Barb.* 538, 551. See, also, *White v. Lumiere Co.,* 79 *Vt.* 206, 64 *A.* 1121, 6 *L. R. A.* (*N. S.*) 807; *First Nat. Bank v. Dana,* 79 *N. Y.* 108; *Etting v. Bank of U. S.,* 11 *Wheat.* 59, 75, 6 *L. Ed.* 419; *Foster v. Berg & Co.,* 104 *Pa.* 324.

The record shows that, in attempting to prove the contract relied on by it, Universal Products Company, the plaintiff in error, not only produced the letters and telegrams above referred to, but, also, introduced evidence of other facts and circumstances tending to show that the parties, by their acts, had recognized the existence of that contract.

This included evidence of the undisputed fact that beginning with the report of February 10, 1928, all of its monthly reports on sales, and the accompanying checks, until the patent rights of Mrs. Emerson had expired, were at the reduced royalty rate provided for by the alleged contract of September, 1926, and that such checks were cashed without protest. It, also, particularly relies on the fact that none of the inferences that could be drawn from the above facts were, in any way, denied by evidence of either Emerson, or his wife, though both were present at the trial.

It does not appear when the plaintiff in error began to manufacture and sell the small joints, but the first sales accounted for at the reduced royalty rate were apparently made in December, of 1927, or considerably more than a year after the contract relied on by it is alleged to have been made.

The letter of Flick to Emerson, dated May 10, 1927, seems to refer to an order for such joints, and states that they intended to start to manufacture them that month. If they did manufacture them at that time, there is no clear explanation as to their failure to account to Emerson at the alleged reduced royalty rate, other than a possible inference that the contract relied on was not regarded as complete until the receipt of the telegram of December 5, 1927.

It may be that the oral evidence relied on by that company, including the attitude of the Emersons, is extremely persuasive in its favor on the contract issue, but when considered with all of the evidence in the case it is not so plain and unequivocal in its nature that it is merely capable of the inferences that it draws from it. In fact, such evidence is capable of the inference that Mr. Emerson, even if authorized to act for his wife, sought to delay definite and final action on her part until her patent rights had expired. The effect of all of this evidence on the making of the alleged contract relied on was, therefore, for the jury to determine. *Hines v. Partridge*, 144 *Tenn.* 219, 231 *S. W.* 16; *Parr v. Northern Elect. Mfg. Co.*, 117 *Wis.* 278, 93 *N. W.* 1099, 1102; *St. John Bros. Co. v. Falkson*, 237 *Mass.* 399, 130 *N. E.* 51; *Chicago & N. W. Ry. Co. v. United States (C. C. A.)*, 234 F. 272, 273; *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 *U. S.* 555, 566, 51 *S. Ct.* 248, 75 *L. Ed.* 544.

In *Chicago & N. W. Ry. Co. v. United States, supra*, the court said:

"Unless it can be said that reasonable minds would not differ in the conclusion to be drawn from the conceded facts, the conclusion must be reached, not by the court as a matter of law, but by the trier of facts, the jury."

By reason of the introduction of the oral evidence above referred to, it would seem that the contract issue in every

aspect of it, including the effect of the language inserted in the telegram of September 27, 1926, referring to a future contract, became a question of fact for the jury to determine, though without such evidence it would have been the duty of the court to decide that question. See *White v. Lumiere & Co.,* 79 *Vt.* 206, 64 *A.* 1121, 6 *L. R. A.* (*N. S.*) 807, and other cases above cited.

Furthermore, as we shall hereafter see, it is clear from the record that the case was tried in the court below on that theory; and we think correctly so.

In *Kelly v. Jackson, et al.,* 6 *Pet.* 622, 632, 8 *L. Ed.* 523, Mr. Justice Story, in considering what was *prima facie* evidence of a fact, said,

"It is such as, in judgment of law, is sufficient to establish the fact; and, if not rebutted, remains sufficient for the purpose. The jury are bound to consider it in that light, unless they are invested with authority to disregard the rules of evidence, by which the liberty and estate of every citizen are guarded and supported. No judge would hesitate to set aside their verdict and grant a new trial, if, under such circumstances, without any rebutting evidence, they disregarded it. It would be an error on their part, which would require the remedial interposition of the court. In a legal sense, then, such *prima facie* evidence, in the absence of all controlling evidence, or discrediting circumstances, becomes conclusive of the fact; that is, it should operate upon the minds of the jury as decisive to found their verdict as to the fact. Such we understand to be the clear principles of law on this subject."

See, also, *Chamb. H. B. on Ev.,* § 409.

We subscribe to the correctness of these principles, but they have no application to the facts of this case.

The argument of the plaintiff in error necessarily concedes that all of the evidence, both oral and written, must be considered in determining whether the contract relied on by it was made. Relying on *Kelly v. Jackson, supra,* it contends, however, that evidence produced by it clearly established a *prima facie* case in support of its claim in that respect; and that such evidence was in no way disputed by the evidence produced by the plaintiff below. It,

therefore, further contends that so far as that question is concerned there was no issue for the jury to determine.

In addition to the acts of the parties, with respect to the monthly reports and checks, and the failure of the Emersons to testify in denial of the evidence produced in support of this contention, the plaintiff in error particularly relies on the telegram of Mr. Emerson to Flick, relating to royalties, following the Flick telegram to him of February 9, 1928, and on the letter of Flick to Emerson dated March 1, 1927, which contains a somewhat similar reference to the same matter.

When this evidence is considered in connection with other evidence in the case, including other ambiguous letters and telegrams subsequent to September 27, 1926, that there is evidence to support the verdict is apparent. That being true, an appellate court certainly cannot hold that the trial court was in error, and abused its legal discretion when it refused to set aside the verdict on a motion for a new trial. This is especially true when the issue was submitted to the jury at the request of the moving party. See *Jordan v. City of Phila. (C. C.)*, 125 *F.* 825; *Hartford Life Ins. Co. v. Unsell*, 144 *U. S.* 439, 12 *S. Ct.* 671, 36 *L. Ed.* 496; *Boone Lumber Co. v. Niedermeyer*, 187 *Mo. App.* 180, 173 *S. W.* 57; *Heller v. Ferguson*, 189 *Mo. App.* 484, 176 *S. W.* 1126; *Tishhouse v. Schoenberg*, 234 *Mich.* 271, 207 *N. W.* 866; *Iowa Sav. Bk. v. Frink*, 1 *Neb. (Unof.)* 14, 26, 92 *N. W.* 916.

The point is not strongly pressed, but it is, also, suggested that Mrs. Emerson, the plaintiff below, is estopped to deny that the original royalty contract was modified by the subsequent agreement made by the parties, relied on by the defendant below, the plaintiff in error.

Manifestly when that defense is relied on, the facts justifying its application must be clearly and satisfactorily proved.

The precise details on which this contention is based are not, however, clearly pointed out. In the letter of Flick to Emerson, dated May 10, 1927, he stated that his company had an offer for 15,000 joints which they intended to start to manufacture that month, and added that "it was only through the cut on your part that we were able to land it." Neither this, nor any other evidence, pointed out by the plaintiff in error, however, clearly and conclusively shows facts on which the court below would have been justified in applying the rule of estoppel against the plaintiff below.

Nor does the record clearly and conclusively show that Victor L. Emerson, acting as agent for his wife, was authorized by her to make the alleged contract of September 27, 1926.

Mr. Emerson, a witness called by the plaintiff, testified on cross-examination that Universal Products Company, the defendant below, operated and made joints under the Killian royalty agreement. He then testified:

"Q. You acted as the agent of the plaintiff (Annette E. Emerson) in all these matters, did you not? The plaintiff is your wife?

"A. Yes, sir.

"Q. And you acted as her agent, did you not, in all the matters pertaining to her contract with Killian, and the assumption of that contract by the defendant (Universal Products Co., Incorporated)?

"A. Yes, sir."

The reports were made to, and the royalty checks were payable to Mr. Emerson, but by the express direction of Mrs. Emerson.

Practically the only other evidence that can have any possible bearing on this question is the telegram of Mrs. Emerson to Flick, dated October 11, 1927, in which she, in substance, said that Mr. Emerson was away on business but that she would "have him attend to the subject matter in your letter."

All of the above facts may be of some evidential value on the question of agency, but they certainly fall far short of conclusively showing the authority of Mr. Emerson to bind Mrs. Emerson by the alleged contract relied on by the plaintiff in error. In fact, the testimony of Mr. Emerson on cross-examination was before any evidence whatever of the alleged modification of the original royalty contract had been produced, and, therefore, before that issue had been injected into the case. This fact is mentioned because of the possible bearing that it may have on the meaning of his testimony.

The court below in refusing the motion for a new trial did not deem it necessary to consider the evidence. It held that the defendant below had waived any possible rights that it might have had, if any, to contend that the evidence did not support the verdict found by the jury, because

1. Conceding that the plaintiff was entitled to a verdict for some amount, it had not requested that Court to give binding instructions on the contract question.

2. It had expressly requested that court to submit the contract issue to the jury.

Some general reference to the second proposition has been made, but, in view of our conclusion that the facts proved made the making of the contract a jury question and that the trial court, therefore, did not abuse its discretion in refusing to grant a new trial, neither of these questions need be considered further by us.

The fifth, sixth and ninth assignments of error relate to prayers of the defendant below which it claims were not granted by the trial court. These prayers are quoted in the statement of facts preceding this opinion, and on referring to them it appears that so far as they were proper they were sufficiently covered by the charge of the court. Nor do we find any error in those portions of the

court's charge incorporated in the seventh and eighth assignments of error.

For the reasons above given, the judgment of the court below is affirmed.