166 A.2d 726 (1960)
PENNSYLVANIA COMPANY, a corporation of the Commonwealth of Pennsylvania, Plaintiff,
v.
WILMINGTON TRUST COMPANY, a corporation of the State of Delaware, and J. Russel Coulter, Trustees under the Will of George P. McNear, Jr., deceased, Defendants, Third-Party Plaintiffs,
v.
Elizabeth M. McNEAR et al., Third-Party Defendants.
Court of Chancery of Delaware, New Castle.
December 9, 1960.
*727 John J. Morris, Jr., of Morris, James, Hitchens & Williams, Wilmington, for plaintiff.
Aaron Finger, of Richards, Layton & Finger, Wilmington, for defendant Wilmington Trust Co., trustee.
Samuel R. Russell, of Morford, Young & Conaway, Wilmington, and Floyd E. Thompson, Chicago, Ill., for defendant J. Russel Coulter, trustee.
Clair John Killoran, of Killoran & VanBrunt, Wilmington, and Sidley, Austin, Burgess & Smith, Chicago, Ill., for adult third-party defendants.
David Snellenberg, II, Killoran & VanBrunt, Wilmington, guardian ad litem for minor third-party defendants.
SEITZ, Chancellor.
Pennsylvania Company ("plaintiff"), a wholly owned subsidiary of the Pennsylvania Railroad Company, commenced this action against the Wilmington Trust Company and J. Russel Coulter[1], trustees under the will of George P. McNear, Jr., deceased. The trustees will be referred to as "defendants" although it is understood that Coulter's predecessor was trustee at the crucial dates here involved.
Plaintiff seeks specific performance of an alleged contract by which the defendants agreed to sell to plaintiff a trust asset in the form of 23,400 shares of stock of the Toledo, Peoria and Western Railroad Company ("T. P. & W."). Plaintiff seeks, alternatively damages from the trust estate for the alleged breach.
Under the terms of the McNear testamentary trust, the defendants held some 73,800 shares of the outstanding T. P. & W. stock, representing 82% thereof. The trustees were given a power of sale by the trust instrument. On April 15, 1955, agents of the corporate defendant met in Philadelphia, Pennsylvania, with officials of plaintiff and of the Atchison, Topeka and Santa Fe Railroad Company ("Santa Fe") to discuss a sale of T. P. & W. stock. Prior discussions concerning the sale to plaintiff and to others had taken place and defendants were conversant with the financial picture  indeed they were "in control" of the T. P. & W.
Plaintiff and Santa Fe were unwilling to buy all of the trustee's holdings but each was interested in purchasing 26% of the total outstanding. After some negotiation, and at the time and place mentioned, the plaintiff wrote and delivered a letter to the *728 defendants dated April 15, 1955, offering to purchase the 26%. Acceptance of the offer was noted on the letter at that time and place on behalf of the defendants, the then individual co-trustee having by telephone authorized an agent of the corporate trustee to endorse his acceptance on the letter. That document reads as follows:
 "April 15, 1955
 "Wilmington Trust Company and Guy
 A. Gladson,
 Trustees under the Will of George
 P. McNear, Jr.
 Wilmington, Del.
"Gentlemen:
"This letter is to confirm the understanding we have reached with you in connection with the stock of the Toledo, Peoria & Western Railroad Company.
"We desire to purchase 23,400 shares of the stock, representing 26% of the total outstanding, at a price of $100. per share, no commissions being involved on either side. This offer is subject to formal approval by our Board of Directors and such approval, if any, as may be necessary from the Interstate Commerce Commission. It is our understanding that the Company will continue to be operated as an independent organization. It is understood that all necessary details to implement this will be worked out by our respective Counsel.
"If this meets your approval, will you kindly indicate your acceptance on the attached carbon.
 "Very truly yours,
 /s/ David C. Bevan
 Vice-President.
 Accepted
 /s/ Jos. W. Chinn, Jr.
 /s/ J. Sellers Bancroft
 for the Trustees u/w of George P.
 McNear Jr."
At the same time and place an offer was received from Santa Fe and accepted by defendants in the same manner. It reads:
 "Chicago, April 15, 1955.
"Wilmington Trust Company,
 Wilmington, Del.
"Mr. Guy A. Gladson,
 Chicago, Ill.
"Co-Trustees under the Will of George
 P. McNear, Jr.
"Gentlemen:
"Pursuant to earlier discussions and my conversation today with Messrs. Chinn and Bancroft, this is to confirm the offer to you for the purchase of 23,400 shares, or 26% of the total number of shares outstanding, of the Toledo, Peoria & Western Railroad Company, at a price of $100 a share net cost to us.
"This offer, as you will understand, is subject to formal approval by the Board of Directors of this Company and such approval as may be necessary from the Interstate Commerce Commission. The payment of the $2,340,000. total amount for the 23,400 shares is to be made upon delivery of the stock when all required approvals have been obtained.
"It is understood that the Toledo, Peoria & Western Railroad Company is to continue its operation as an independent organization after our acquisition of the above described stock. As we agreed, all necessary details, including a purchase agreement, will be arranged by our respective legal representatives.
"If this offer has your acceptance, will you kindly so indicate on the enclosed copy of this letter.
 "Sincerely yours,
 /s/ E. S. Marsh
 Vice-President  Finance.
Accepted
/s/ Jos. W. Chinn Jr.
/s/ J. Sellers Bancroft
for the Trustees u/w of George P.
 McNear Jr."
By letter dated April 20, 1955, plaintiff sent the corporate trustee's attorney drafts *729 of resolutions to be adopted by plaintiff's board of directors. The letter and the accompanying resolutions are also set forth in full:
 "April 20, 1955
"Robert H. Richards, Jr., Esq.
Richards, Layton and Finger
4072 Du Pont Building
Wilmington, Delaware
"Dear Mr. Richards:
"I enclose herewith for your review two copies of draft of resolutions of the Board of Directors of Pennsylvania Company providing for the purchase of stock from Wilmington Trust Company and Guy A. Gladson, Trustees under the Will of George P. McNear, Jr.
"We are preparing draft of agreement for purchase and sale of this stock, and I will forward same to you shortly.
 "Very truly yours,
 /s/ Edwin K. Taylor
 Edwin K. Taylor
 Assistant General Counsel
EKT:hh
Enc."
"Pennsylvania Company
Board of Directors
"Resolved, that the Board approves and authorizes the purchase from Wilmington Trust Company and Guy A. Gladson, Trustees under the will of George P. McNear, Jr., or their successors or assigns, of 23,400 shares of stock of Toledo, Peoria & Western Railroad Company at a price of $100 per share or an aggregate purchase price of $2,340,000, and the President, any Vice-President or the Treasurer is authorized to execute and deliver a contract providing for such purchase, subject to any required approval of the Interstate Commerce Commission, said contract to be in such form and to contain such terms and provisions as may be approved by the officer executing the same, such execution by said officer to be conclusive evidence of his approval thereof.
"Resolved, that James M. Symes, President, David C. Bevan, Vice-President, and W. R. Gertstnecker, Treasurer, or any of them, is hereby authorized to sign, verify and file such application or applications to the Interstate Commerce Commission, or any other regulatory or administrative body, as may be required in connection with the purchase of shares of stock of Toledo, Peoria & Western Railroad Company, including an application for joint control of said railroad company, or of its properties.
"Resolved, that the proper officers of the Company are severally authorized to execute, deliver, file, record and approve, or to cause to be executed, delivered, filed, recorded and approved, under the corporate seal of the Company, or otherwise, any and all certificates, instruments, documents and papers, including supplements to or amendments of the above-authorized stock purchase contract, and to do all such acts and things as may be necessary or appropriate to effectuate the foregoing transaction (including taking such action as may be required by orders of the Interstate Commerce Commission)."
A proposed formal contract went through three drafts. The third draft was considered at a meeting in Chicago and at that time was initialed by agents of the plaintiff and Santa Fe and by the authorized agent for the corporate trustee, who, however, made it "subject to the approval of counsel". The then individual trustee was unwilling to sign or initial the draft. He did state that it was satisfactory but preferred not to initial it until it was approved by his counsel as to form. However, it was never executed because of events hereafter described.
*730 Prior to defendants' negotiations with plaintiff and Santa Fe, the corporate trustee had repeatedly been pressed by the representative of another railroad to sell it the T. P. & W. stock. The top range of any offer from this source before April 15 was $99 per share. By letter dated May 5, 1955 the defendants received an offer from this same source to purchase the stock covered by the alleged agreement and all the additional stock held by the trustees at a price of $133.33 per share. When certain beneficiaries of the trust learned of the higher offer they insisted that the trustees had a duty to accept the higher offer. At the same time the attorney for the defendants and the attorney for various beneficiaries advised defendants that there was still no binding obligation existing between the defendants and plaintiff and Santa Fe because the "formal" agreement had not been executed.
The defendants finally adopted the position that there was no binding commitment to plaintiff and Santa Fe and thus were free to negotiate a higher price. It seems clear from the record that the agents of the corporate co-trustee took this course of action with evident reluctance and solely because of the opinion of counsel and the pressure of the beneficiaries. Thereupon, the defendants offered to sell the stock to the plaintiff and Santa Fe at a price better than $133.33 a share and fixed a short deadline for acceptance. Plaintiff made no further offer, contending that it had a binding agreement. Santa Fe offered to pay $135 per share for all of the T. P. & W. stock held by the defendants. The defendants accepted the Santa Fe offer and the sale was consummated. This action followed.
Defendant, Wilmington Trust Company, filed a third-party complaint against the trust beneficiaries. The beneficiaries filed answers both to the third party complaint and the plaintiff's complaint. Plaintiff and defendants filed cross-motions for summary judgment. The third party defendants filed no motion but they support defendants' motion and resist plaintiff's motion. This is the decision on the motions. I shall first consider defenses asserted by the various defendants generally.
All the defendants contend that the April 15 letter was not intended by the parties to constitute a binding agreement.[2] They say that this is so even if the court adopts all the testimony and other matters in the record which are most favorable to plaintiff. Plaintiff in effect replies that the letter evidences an intent to be bound and thus plaintiff must succeed. Plaintiff adds that the same result follows, a fortiori, when the other evidence in the record is considered.
The court is met at the outset with the question as to whether Pennsylvania or Delaware law must be applied in deciding whether the April 15 letter became an effective agreement.
Defendants appear to concede that except for the trust aspect of the matter, Pennsylvania law, both statutory and decisional, would control.[3] This is under the familiar rule that the place of contracting governs the issue as to the validity of a contract. See Harris v. New York Life Ins. Co., 27 Del.Ch. 170, 33 A.2d 154. Nor do the defendants argue that they lacked the power to enter into a contract outside the state. What defendants say is that Delaware law must be applied to determine *731 whether or not a binding contract was executed on April 15, 1955 because of the following provision in the trust agreement: "I direct further that the laws of the State of Delaware shall be controlling as to all questions pertaining to the Trusts by my said Will created * * *."
Plaintiff replies that the quoted provision deals with questions as to the power of the trustees and questions of administration but does not apply to the issue of the validity of the trustees' contract made in the State of Pennsylvania.
It seems to the court that the quoted trust provision was intended to apply to questions of power, administration and the like. Certainly, a person dealing with a trustee is on notice as to the power granted the trustee in the trust instrument. However, we are dealing here with a trustee making a contract to sell trust property pursuant to an admittedly valid power of sale. The issue as to the existence of an agreement is not one pertaining to the trust. Nor is there any particular policy reason, based on uniformity or otherwise, which would call for an application of Delaware law. Indeed, it may be doubted that a court could take such provincial view of the subject matter.
Defendants note that it was contemplated in the drafts of the formal agreement that settlement "was to be in Wilmington." They suggest that this shows that the parties intended that Delaware law was to control. Defendants confuse the law relating to performance of a contract with the question of essential validity. See 2 Beale, Conflict of Laws, § 332.1.
I conclude that neither the quoted provision of the trust or the intended place of performance is applicable to alter the general rule that the place of making of a contract governs its validity. Thus, Pennsylvania law is here controlling. Compare 2 Beale, Conflict of Laws, § 332.2.
What is the Pennsylvania law? I believe the following Pennsylvania Statute (Art. 2, Sec. 2-204, (3)) of the Uniform Commercial Code adopted by Pennsylvania in 1953 (12A Pa.Stat.Ann., § 2-204 (3)) is controlling:
"Even though one or more terms are left open a contract for sale does not fail for indefiniteness if the parties have intended to make a contract and there is a reasonably certain basis for giving an appropriate remedy."
The comment of the American Law Institute and the National Conference of Commissioners on Uniform Law is illuminating.[4] It states:
"Subsection (3) states the principle as to `open terms' underlying later sections of the Article. If the parties intend to enter into a binding agreement, this subsection recognizes that agreement as valid in law, despite missing terms, if there is any reasonably certain basis for granting a remedy. The test is not certainty as to what the parties were to do nor as to the exact amount of damages due the plaintiff. Nor is the fact that one or more terms are left to be agreed upon enough of itself to defeat an otherwise adequate agreement. Rather, commercial standards on the point of `indefiniteness' are intended to be applied, this Act making provision elsewhere for missing terms needed for performance, open price, remedies and the like.
"The more terms the parties leave open, the less likely it is that they have intended to conclude a binding agreement, but their actions may be frequently conclusive on the matter despite the omissions."
There appears to be no pertinent court authority interpreting this rather recent but controlling statute. In an article entitled "The Law of Sales In the Proposed *732 Uniform Commercial Code," 63 Harv.Law Rev. 561, 576, Mr. Williston wanted to limit omissions to "minor" terms. He wanted "business honor" to be the only compulsion where "important terms" are left open. Nevertheless, his recommendation was rejected (see note on p. 561). This shows that those drafting the statute intended that the omission of even an important term does not prevent the finding under the statute that the parties intended to make a contract.
The court is confronted with the issue, posed by defendants, as to whether the letter and resolutions so clearly show an intent not to be bound until a formal agreement was executed that no evidence of surrounding circumstances could vary those expressions of intent. The reading of the April 15 letter and subsequent resolutions leave one in doubt concerning the intent of the parties. Certainly this is true insofar as defendants' contention is concerned. Thus, one immediately asks why the letter was expressed in effect in terms of offer and acceptance of identified property for an agreed price if it was not to have legal significance. Under Pennsylvania and Delaware law the fact that the parties clearly contemplated the subsequent execution of a formal agreement does not, under the language here employed, ipso facto negate an intent to be bound before that time. If it were otherwise, many of the cases in the books would never have arisen.[5] The issue is generally resolved by an evaluation of all relevant facts.
The question here is one of intent and I conclude that the intent is not so clearly expressed in the letter that other evidence is not admissible to aid in ascertaining it.
Defendants next argue that the plaintiff's board of directors, by their resolutions, imposed the requirement that the parties execute a formal written agreement before the parties were bound. I gather from the statements of defendants' counsel at oral argument that it is not contended that the resolutions differed from the April 15 letter. Indeed, the resolutions in question were cleared by plaintiff with the corporate defendant's counsel before being passed and there was no intimation that defendants' counsel believed that they deviated from the terms of the April 15 letter agreement. In any event, I do not believe that they did so in fact. Thus, I think the problem of interpretation is the same whether we focus on the letter or plaintiff's resolutions.
Defendants next argue that approval by the I.C.C. was a condition precedent to the effectiveness of the April 15 letter, and the failure of plaintiff to apply for such approval rendered the April 15 letter inoperable. Although the wording of the April 15 letter leaves the matter open to proof as to the need therefor, I shall assume that such approval was called for by the facts.
The record to date demonstrates that defendants themselves, by working on the various drafts, lulled plaintiff into delaying its application to the I.C.C. On the present record it would appear that plaintiff was excused from its assumed duty and the defendants' obligation was fixed. 3 Williston on Contracts, (3rd ed.), § 677; Cartmell Paint & Glass Co. v. Cartmell, 7 W.W. Harr. 528, 186 A. 897; Martin v. Star Publishing Co., 11 Terry 181, 126 A.2d 238. Thus, I need not consider plaintiff's contention that in substance the I.C.C. has approved plaintiff's purchase by its later action.
Turning now to the next segment of the Pennsylvania statute, defendants contend that there is here no reasonably certain basis for granting plaintiff an appropriate remedy, as the statute requires. The sole reason given by defendants to support their contention is that the April 15 letter provides no reasonably certain *733 basis for granting relief. First of all, I think defendants confuse the problem of "definiteness" with the issue of "remedy". The part of the statute now being discussed deals with the basis for granting a remedy and proceeds on the assumption that a binding agreement has been breached. Next, plaintiff is not confined to the letter in attempting to prove that there is a reasonably certain basis for granting a remedy. Indeed, plaintiff indicates that it will be satisfied with the alternative relief requested, namely, damages, rather than a decree of specific performance. It is not unusual to have a contract which is not sufficiently definite to be specifically enforced yet which, upon breach, justifies the granting of damages. See Gulbenkian v. Gulbenkian, 2 Cir., 147 F.2d 173, 158 A.L.R. 990. There is no basis for concluding at this stage that plaintiff will be unable to produce evidence which might justify the finding that there is a reasonably certain basis for granting plaintiff one of the remedies requested.
Thus, defendants' motion for summary judgment must be denied. I say this because defendants have not shown on the present record that plaintiff will be unable to prove that the April 15 letter was intended to constitute a binding agreement which defendants breached and that an appropriate remedy can be granted.
Turning now to plaintiff's motion for summary judgment, defendants point to several alleged material facts which they say are in dispute and prevent the granting of plaintiff's motion. Both Marsh (present president of Santa Fe) and Taylor (Assistant General Counsel of Pennsylvania Railroad) were present at the time the April 15 letter was signed. Marsh, in his deposition, says at one place that when the April 15 letter was being drafted, Taylor said that a certain provision need not be incorporated "* * * because there would be a purchase agreement prepared and the letter of April 15 was not legally binding and the lawyers would have to get together and prepare a purchase contract". Other portions of the deposition leave some doubt as to the full scope of the quoted language. Taylor, in his affidavit, directly contradicts Marsh by saying that he never said the letter was not legally binding.
Plaintiff replies by arguing that the testimony would be inadmissible at trial because it has no probative value and even if admitted would raise no genuine issue as to any material fact. Plaintiff goes on to attempt to show that the statement, if made by Marsh, could not have had the slightest influence upon the parties insofar as their intent to be bound was concerned. It bases this on its argument that the evidence shows that the parties had agreed before Taylor was even called into the meeting. I cannot agree that the court can adopt plaintiff's approach when seeking to ascertain the "open" question of intent. The court cannot at this stage on this issue give conclusive effect to some evidence because contradictory evidence is far outweighed in the record. Certainly, if a lawyer advises his client in the presence of all parties that a letter agreement he is about to sign is not legally binding that is some evidence that his client did not intend it to bind him when he signed. Such evidence would not run afoul of the rule that the legal effect of the transaction is for the court to decide. Such evidence, if accepted, would merely be part of the surrounding circumstances to be considered in resolving the intent issue.
The third party defendants, in their answer to plaintiff's complaint, plead certain defenses (first four affirmative defenses). The subject matter of these defenses is not sufficiently complete and clear to the court to warrant a decision on them at this time. They will also be tried along with all other unresolved claims unless a different procedure is adopted.
My evaluation of the record compels the conclusion that plaintiff's motion for summary judgment must also be denied.
Present order on notice.
NOTES
[1] Coulter was appointed successor trustee to Guy A. Gladson on September 10, 1956. Thus, he did not participate as trustee in any of the transactions giving rise to the complaint. However, plaintiff seeks no personal judgment and so he is only defending the trust.
[2] Defendants say that the April 15 letter was not intended to constitute a binding contract because it was by its terms made subject to final approval by plaintiff's board. Obviously, such approval was a condition but I do not believe its inclusion in the letter prevented a binding commitment from coming into existence when the condition was met, if the parties so intended.
[3] The individual co-trustee seems to argue that Pennsylvania law does not govern because his written approval of the authority to sign the April 15 letter was given in Florida. One of several answers is that on April 15 he orally authorized his agent to endorse his approval in Pennsylvania. That made the acceptance in Pennsylvania. See 2 Beale, The Conflict of Laws, § 328.1.
[4] Such comments may be consulted in the construction and application of the Act. The Act itself so provides.
[5] E. g., Universal Products Co. v. Emerson, 6 W.W.Harr. 553, 179 A. 387, 100 A.LR. 956.