**ANCHOR MOTOR FREIGHT,**
Employer/Appellant,

v.

**Michael CIABATTONI, Sr., (Mary Ciabattoni, individually, and as the personal representative of the Estate of Michael Ciabattoni, Sr.), Claimant/Appellee.**

No. 359, 1997.

Supreme Court of Delaware.

Submitted: May 26, 1998.
Decided: Aug. 12, 1998.

J. Kate Stickles, of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for Appellant.

Michael W. Modica, Wilmington, for Appellee.

Before VEASEY, C.J., and WALSH, HOLLAND, HARTNETT and BERGER, JJ., constituting the Court en Banc.

BERGER, Justice:

We accepted this interlocutory appeal in order to resolve a question about the authority of the Industrial Accident Board to approve compensation agreements. The Board denied a petition to enforce an agreement modifying disability benefits because the injured employee died before the agreement was completed and submitted to the Board for approval. The Superior Court reversed, based on its interpretation of a statute governing commutation agreements. We conclude that the agreement in issue is not a commutation agreement; it is a general "agreement on compensation or benefits."[1] We hold that compensation agreements are enforceable by the Board after an employee's death. Accordingly, we affirm the Superior Court's decision, but for different reasons.

### I. Factual and Procedural Background

In 1971, Michael Ciabattoni, Sr. was injured in a work-related accident while working for Anchor Motor Freight. He entered into a compensation agreement with his employer and began receiving permanent disability benefits shortly after the accident. In the summer of 1995, Ciabattoni became entitled to greater benefits as a result of an amendment to 19 *Del. C.* § 2334. On October 10, 1995, David Miles, a claims consultant for Anchor's insurance carrier, contacted Ciabattoni's son, Michael Ciabattoni, Jr., to discuss the increased benefits. Miles told Michael, Jr. that, as an alternative to the statutory increase, Ciabattoni could enter into a buyout agreement, or structured settlement, that would provide payments over a specified period of time based on Ciabattoni's life expectancy.

On October 12, 1995, in a letter to Michael, Jr., Miles made two settlement proposals:

> I propose paying monthly benefits in the amount of $494 per month which would be guaranteed for your father's life. Should he pass away within [a] five-year period, your mother would derive additional benefits for the balance of the five-year period. A second proposal would pay your father at $550 per month for live (sic), but this would not be guaranteed, i.e. there would be no ongoing benefits for Mrs. Ciabattoni.

> Would you please review the attached quotes, discuss them with your parents, and call me at the telephone numbers referenced below.

Michael, Jr. brought the letter with him when he went to visit Ciabattoni in the hospital on October 18, 1995.[2] Ciabattoni and his family discussed the settlement proposals and agreed that Ciabattoni should accept the $494 per month option. Ciabattoni's daughter, acting under a durable power-of-attorney, signed and dated Miles' letter, writing: "As attorney-in-fact for Michael J. Ciabattoni, Sr., I hereby accept the $494.00 per month proposal." The next morning, Michael, Jr. called Miles and told him that Ciabattoni had accepted the $494 per month option and that his sister, acting on behalf of Ciabattoni, had signed Miles' letter. Less than one hour later, Ciabattoni died.

---

1. 19 *Del. C.* § 2344.

2. Ciabattoni was being treated for an unspecified illness. According to Michael, Jr., the family expected Ciabattoni to recover and be discharged within a few weeks.

By letter dated November 15, 1995, Miles informed Michael, Jr. that the insurance carrier would not "go forward" with the settlement because it was not approved by the Industrial Accident Board. Ciabattoni's estate responded by filing with the Board a "Petition for Specific Performance and/or Modification of Compensation Agreement." The Board conducted a hearing and found that the parties had reached a meeting of the minds as to the material terms of an agreement to commute benefits. Nonetheless, the Board denied the petition:

> [T]he Board finds that the benefits sought to be commuted did not survive Claimant's death. Moreover, there was no petition filed and/or pending at the time of Claimant's death, nor was there any agreement before the Board for review and approval.

On appeal, the Superior Court affirmed the Board's finding with respect to the existence of an agreement. The court then analyzed the statute governing commutation agreements and construed it liberally, as authorizing the Board to approve and enforce commutation agreements after an employee's death.

## II. Discussion

■ Board decisions are reviewed in this Court by the same standards as are applied in the Superior Court. The Board's factual findings will be upheld if they are supported by substantial evidence, which means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[3] Questions of law, whether decided by the Board or the Superior Court, are reviewed *de novo*.[4]

The first issue on appeal is whether the Board erred in finding that there is an agreement between the parties to modify Ciabattoni's compensation. Anchor argues that the parties had been discussing an agreement, but that they never intended to be bound by any agreement until after a formal contract was fully executed and approved by the Board. Anchor notes that: (i) Michael, Jr. was not authorized to act on behalf of his father; (ii) Miles and Michael, Jr. had not discussed how the new agreement would affect Ciabattoni's medical benefits; and (iii) Michael, Jr. knew that the insurer was going to prepare a contract that would be presented to the Board for approval. From these facts, Anchor argues that the parties "clearly understood that the terms of [the] proposed contract, although tentatively agreed on, [would] be reduced to writing and signed before it [would] be considered as complete and binding. . . ."[5] Therefore, as a matter of law, there was no contract.

■ Anchor's statement of the law is generally correct. There is no enforceable contract if the parties do not intend to be bound before a formal written agreement is drafted and signed. The fact that the parties intend to execute a formal agreement, however, is not dispositive. The question is whether the parties positively agree that there will be no binding contract until the formal document is executed.[6] The intent of the parties is generally a question of fact and in this case the Board was the fact finder. The Board evaluated the evidence and concluded that the parties had reached a meeting of the minds as to all material terms and had entered into a binding agreement notwithstanding the absence of a formal contract.

■ There is substantial evidence to support the Board's finding. Michael, Jr. testified that he "knew there was a deal" after

---

3. *Olney v. Cooch*, Del.Supr., 425 A.2d 610, 614 (1981).

4. *State v. Cephas*, Del.Supr., 637 A.2d 20, 23 (1994).

5. *Universal Products Co. v. Emerson*, Del.Supr., 179 A. 387, 394 (1935).

6. *Ibid. See also Itek Corp. v. Chicago Aerial Indus., Inc.*, Del.Supr., 248 A.2d 625, 629 (1968) (applying Illinois law, Court held that whether enforceable contract arises from preliminary negotiations and letter of intent or must await formal agreement depends on intent of parties). In *Itek Corp.*, this Court reversed a grant of summary judgment. After the trial on remand, this Court approved the use of expert testimony to explain the meaning and significance of letters of intent and the trial court's jury instruction that was consistent with this Court's earlier decision. *Itek Corp. v. Chicago Aerial Indus., Inc.*, Del. Supr., 274 A.2d 141 (1971).

talking with Miles on October 19, 1995 and telling him that the family had selected the $494 per month option. Miles' October 12 letter specified the term of the direct payments, the monthly amount, the term and amount of the death benefit, and the person who was to receive the death benefit. Although the letter made no reference to Ciabattoni's medical benefits, the record establishes that Ciabattoni had not been paid any medical benefits since 1992. Thus, the Board could fairly infer that medical benefits were not material to the parties' agreement. Finally, Ciabattoni indicated his acceptance of the agreement by having his daughter sign and date Miles' letter. This evidence supports a finding that the parties reached a binding agreement before a formal contract was drawn up and executed.

The second issue is whether the Board has the authority to act on an agreement to modify compensation after the employee's death. The Superior Court assumed, without deciding, that Anchor and Ciabattoni entered into a commutation agreement.[7] In analyzing the statute governing commutations, the Superior Court focused on a provision allowing commutations if they are in the best interest of the employee "or the dependents of the deceased employee...."[8] The court construed this language as authorizing the Board to approve commutation agreements after a claimant's death as long as it finds that the commutation agreement will be in the best interest of the dependents of the deceased employee.

This Court begins its *de novo* review by considering whether the agreement between Anchor and Ciabattoni is, in fact, a commutation agreement. Section 2358 provides in relevant part:

Upon application of either party, and on due notice to the other, the compensation contemplated by this chapter may be commuted by the Board at its present value when discounted at 5% interest, with annual rests, disregarding except in commuting payments due under Section 2324 of this

title the probability of the beneficiary's death. Such commutation may be allowed if it appears that it will be for the best interest of the employee or the dependents of the deceased employee....

The parties involved in a workers' compensation claim frequently would prefer one large lump sum payment instead of many small monthly payments that may extend for years. Yet the workers' compensation system is intended to partially replace a disabled worker's income stream during the period of disability. If the disabled worker receives one lump sum payment, the money may be dissipated before the disabled worker is ready to return to the work force. This statute protects against the problems inherent in "lump-summing" by requiring the Board to evaluate whether a commutation serves the employee's best interest.[9]

The agreement at issue does not provide for a lump sum payment, determined by calculating the present value of Ciabattoni's monthly benefits for the remainder of his life expectancy, and it does not in any way compress or consolidate Ciabattoni's benefits. Rather, the new agreement continues Ciabattoni's monthly payments at a slightly reduced rate and it provides a possible death benefit in the event of Ciabattoni's death within five years. In short, the new agreement does not fit either within the express terms of § 2358 or the statute's general purpose.

■ Ciabattoni's agreement with Anchor is properly classified an "agreement on compensation or benefits" covered by 19 *Del.C.* § 2344. Under that statute, if an employee and employer "reach an agreement in regard to compensation or other benefits ..., a [signed] memorandum ... shall be filed with the Board and, if approved by it, shall be final and binding...." The question remains, however, whether the Board may approve an agreement on compensation or benefits after the employee's death. Section 2344, like § 2358, is silent on this point.

---

7. The Board referred to it as an agreement to commute benefits and it does not appear that the parties disputed this point in their arguments to the Superior Court.

8. 19 *Del.C.* § 2358.

9. *Molitor v. Wilder,* Del.Super., 195 A.2d 549, aff'd., Del.Supr., 196 A.2d 214 (1963).

The Worker's Compensation Act is construed liberally to accomplish its two primary purposes of providing prompt payment of benefits without regard to fault, and relieving employers and employees of the burdens of civil litigation.[10] It also must be construed in a way that attempts to harmonize any conflicting provisions.[11] In this case, a liberal reading of § 2344 would allow the Board to approve an agreement on compensation or other benefits regardless of whether the claimant has died. The statute does not expressly limit the Board's authority, and it promotes the overall purposes of the Act for the Board to make final and binding agreements between claimants and employers.

This approach is problematic, however, in light of §§ 2324, 2325 and 2332. The first two statutes govern compensation for total and partial disabilities, respectively. The third, § 2332, sets forth how an employee's death impacts entitlement to compensation and other benefits. It concludes with the statement, "no payment or award under § 2324 or § 2325 of this title shall continue or be ordered beyond the date of such injured employee's death." [12]

Ciabattoni was receiving payments, under a compensation agreement, for a total disability. If his entitlement ceased at the time of his death, how could the Board consider, or enforce, an agreement that would provide for payments beyond the date of his death? Stated another way, since Ciabattoni's disability benefits ceased at the time of his death, there is no compensation that can be the subject of a new compensation (or commutation) agreement.

■ We conclude that this seeming inconsistency is reconcilable. The Workers' Compensation Act contemplates two methods by which employees may secure the benefits to

which they are entitled—by agreement with the employer or by an award from the Board. As noted above, agreements between the parties must be approved by the Board before they are final and binding. Those agreements must be consistent with the statutory scheme, but they do not necessarily have to match the statutory provisions precisely.[13]

■ Thus, parties to a compensation agreement may, as in this case, provide for payments other than those specifically allowed by statute. Still, their agreement must be reviewed and approved by the Board. Where, as here, the parties entered into an agreement that provides for payments after the employee's death, there is no reason to limit the Board's authority to consider that agreement. If the Board approves the agreement, it will not be ordering a payment or entering an award under § 2324 or § 2325. It will be entering an order approving an agreement under § 2344. Thus, there is no inconsistency between the statutory provisions.

In reaching this conclusion, we are not unmindful of the fact that other jurisdictions have taken a narrower view of a Board's power to act after an employee's death. We note that, in many of the reported decisions on this issue, it was the employer attempting to avoid its obligations under a settlement or commutation agreement and the employer's position was not predicated upon the employee's deceit or failure to disclose his or her state of health.[14] The employer had made a bargain that, in hindsight, was not as beneficial as originally anticipated. We do not think it serves the purposes of the Workers' Compensation Act to allow parties to avoid their commitments based on the fortuity of

10. *Champlain Cable Corp. v. Employers Mut. Liab. Ins. Co.*, Del.Supr., 479 A.2d 835 (1984).

11. *State v. Reynolds*, Del.Supr., 669 A.2d 90 (1995).

12. *Magness Constr. Co. v. Waller*, Del.Supr., 269 A.2d 554 (1970) (Total disability payments cease upon the death of the employee).

13. The terms of an agreement on compensation must "conform to this chapter." 19 *Del. C.* § 2344.

14. *See, e.g., Sherlin v. Liberty Mutual Ins. Co.*, Tenn.Supr., 584 S.W.2d 455 (1979); *Barncord v. State*, 4 Kan.App.2d 368, 606 P.2d 501 (1980); *Odom v. Tosco,* 12 Ark.App. 196, 672 S.W.2d 915 (1984); *Ciambrone v. A, C and S, Inc.*, R.I.Supr., 649 A.2d 1027 (1994).

whether a claimant dies before the Board acts.

Based upon the foregoing, the judgment of the Superior Court is AFFIRMED and this matter is REMANDED to the Superior Court for the entry of an order remanding this matter to the Industrial Accident Board for further action in accordance with this opinion.